[Civ. No. 6664. Fifth Dist. Dec. 27, 1982.]

TWAIN HARTE HOMEOWNERS ASSOCIATION, INC.,
Plaintiff and Appellant, v.
COUNTY OF TUOLUMNE et al., Defendants and Respondents.

666

668

**COUNSEL**

Alexander T. Henson for Plaintiff and Appellant.

Stephen Dietrich, Jr., County Counsel, for Defendants and Respondents.

OPINION

MORONY, J.*—

STATEMENT OF THE CASE

This appeal arises out of challenges to the sufficiency of the Tuolumne County General Plan and to the adequacy of the environmental impact report prepared in connection with adoption of the general plan. "The Planning and Zoning Law (Gov. Code, tit. 7, div. 1, commencing with § 65000) requires[s] . . . that the board of supervisors of each county adopt a general plan for the 'physical development' of the county, pursuant to section 65300; that the plan be prepared and adopted according to standards established in section 65300.5 and 65301; and that it include each of nine 'elements' enumerated and described in section 65302." (*Camp* v. *Board of Supervisors* (1981) 123 Cal. App.3d 334, 340 [176 Cal.Rptr. 620], fn. omitted.)[1]

The California Environmental Quality Act (CEQA) mandates that prior to adoption of a general plan the county must prepare an environmental impact report (EIR) "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.)

On August 18, 1980, the Tuolumne County Board of Supervisors held a hearing at which time they certified the completion of the EIR (also referred to as the MEIR) for the new county general plan. Also on August 18, 1980, the board approved several changes to the wording of the draft general plan and its

---

*Assigned by the Chairperson of the Judicial Council.

[1]Except where otherwise indicated, statutory citations are to provisions of the Government Code as they read in 1980.

Section 65302 provided in pertinent part as follows: "The general plan shall consist of a statement of development policies and shall include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals. The plan shall include the following elements: [¶] (a) A land use element . . . . [¶] (b) A circulation element . . . . [¶] (c) A housing element . . . . [¶] (d) A conservation element . . . . [¶] (e) An open-space element . . . . [¶] (f) A seismic safety element . . . . [¶] (g) A noise element . . . . [¶] (h) A scenic highway element . . . . [¶] (i) A safety element . . . ."

Section 65302 is not quoted in full because of its length. Some of the passages deleted here are quoted later in the text.

In 1980 section 65300.7 was added (eff. Jan. 1, 1981) to provide as follows: "65300.7. The Legislature finds that the diversity of the state's communities and their residents requires planning agencies and legislative bodies to implement this article in ways that accomodate local conditions and circumstances, while meeting its minimum requirements." (Added by Stats. 1980, ch. 837, § 1, p. 2617.)

action was referred back to the planning commission for recommendation. Thereafter, on August 26, 1980, James Nuzum, Tuolumne County Planning Director, informed the board that the proposals approved by the board for changes in wording of the draft general plan were consistent with the existing environmental impact report which had been certified and approved by the board on August 18. On that date the board adopted the present Tuolumne County General Plan.

On October 1, 1980, appellant Twain Harte Homeowners Association, Inc. filed the instant action in the Tuolumne County Superior Court, seeking a writ of mandate compelling respondent Tuolumne County (hereinafter County) to rescind its certification of the EIR and to prepare a new EIR in compliance with CEQA. Appellant also sought injunctive relief pending preparation of a new EIR and preventing respondent from approving under the new general plan any projects having a significant impact on the environment. An amended petition was filed on December 30, 1980, amending the allegations concerning the EIR and adding a second cause of action seeking to compel County to set aside the general plan and to prepare and adopt a new one in compliance with Government Code section 65302, and further, seeking to recover attorney fees.

On December 30, 1980, an alternative writ of mandate was issued by the superior court. On March 10, 1981, the hearing on the return of the alternative writ was held, together with the motion for a preliminary injunction.

Following trial and posttrial briefing the trial court on July 30, 1981, entered judgment issuing the writ of mandate commanding the County to reconsider including timberland class 3 on the Arvantis scale in the general plan. The court also retained jurisdiction to consider County's action taken in light of the writ. The remainder of the writ was denied and the alternative writ was discharged.

Twain Harte Homeowners Association, Inc. appeals from the denial of the remainder of the writ.

## APPELLANT'S CONTENTIONS

Appellant contends:

1. That the *EIR* is legally inadequate as it was not prepared and certified pursuant to the mandate of CEQA in that (a) it does not disclose the criteria for determining water and sewer availability, (b) County's responses to comments about the draft EIR were inadequate, (c) mitigation measures described in the EIR were not included in the general plan, and (d) alleged environmental impacts of changes made in the draft general plan, after the EIR was certified, were not analyzed prior to the adoption of the general plan.

2. That the *general plan* is legally inadequate in that its land use, circulation, and housing elements do not substantially comply with the requirements of Government Code section 65302.

STANDARD OF REVIEW

*The EIR.*

■ This court in *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 352-353 [173 Cal.Rptr. 390] discussed the standard of review applicable when reviewing the sufficiency of environmental impact reports as follows: "The standard for review of the county's action, is whether it prejudicially abused its discretion. Such abuse is established if the County has not proceeded in a manner required by law or if the agency's determination is not supported by substantial evidence. ([Pub. Resources Code,] § 21168.5; *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 840 . . . ; see *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 . . . .)"

As the court stated in *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 705 [104 Cal.Rptr. 197]: "The court does *not* have the duty of passing on the validity of the conclusions expressed in the EIR, but only on the sufficiency of the report as an informative document. . . ." This was further amplified in *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804-805 [161 Cal.Rptr. 260] as follows: "*In reviewing an EIR a paramount consideration is the right of the public to be informed in such a way that it can intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision.* But the following principles must also be considered. *The EIR is not an action document. Its purpose is to inform governmental decision makers and to focus the political process upon their action affecting the environment.* (*City of Rancho Palos Verdes* v. *City Council, supra,* 59 Cal.App.3d 869, 890. . . .) . . . *The degree of specificity in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR.* ([Cal. Admin. Code, tit. 14,] § *15147.*) 'An EIR should be prepared with a sufficient degree of analysis to provide decision makers with information which enables them to make a decision which intelligently takes account of environmental consequences. *An evaluation . . . need not be exhaustive. . . .* Disagreement among experts does not make an EIR inadequate. *The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.*' ([Cal. Admin. Code, tit. 14,] § 15150.) Even where specific guidelines have been urged upon the courts as requiring a narrow and restricted approach by the governmental agency, the courts have followed the general tenor of the guidelines, indicating that they are subject to a construction of reasonableness and the court will not seek to impose unreasonable extremes

or to inject itself within the area of discretion as to the choice of action to be taken. (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* [1979] 89 Cal.App.3d [274] 286, 287 . . . .)" (Italics added.)

*The General Plan.*

Government Code section 65301.5 provides that, "The adoption of the general plan or any part or element thereof or the adoption of any amendment to such plan or any part or element thereof is a legislative act which shall be reviewable pursuant to Section 1085 of the Code of Civil Procedure." (Added by Stats. 1980, ch. 837, § 2, p. 2617.)

■ As stated in *Karlson* v. *City of Camarillo, supra,* 100 Cal.App.3d 789, 798: "Actions taken by an administrative agency in its legislative capacity are reviewable under Code of Civil Procedure section 1085, the traditional writ of mandate. Judicial review is limited to an examination of the proceedings before the agency to determine whether its action has been arbitrary or capricious, or entirely lacking in evidentiary support, or whether it has failed to follow the procedure and give the notices required by law. (*Strumsky* v. *San Diego County Employees Retirement Assn.* [1974] 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29].)"

■ Consequently, under CEQA, judicial review of a general plan adopted by a board of supervisors is governed by Public Resources Code section 21168.5 which provides that: "In any action or proceeding, other than an action or proceeding under section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of non-compliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

Our inquiry will thus extend to whether the general plan "substantially complies" with the requirements of the Government Code. (*Camp* v. *Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620].) " 'Substantial compliance, as the phrase is used in the decisions, means *actual* compliance in respect to the substance essential to every reasonable objective of the statute,' as distinguished from 'mere technical imperfections of form.' [Citations.]" (*Ibid.*) Since such determination is a matter of law, this court need not give deference to the trial court's findings. (*Id.* at p. 362.)

It is clear that in reviewing the determination of the board of supervisors the court may not probe the merits of the general plan. (*Selby Realty Co.* v. *City of*

*San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111]; *Camp* v. *Board of Supervisors, supra,* 123 Cal.App. 3d at p. 348.)

DISCUSSION

1. *The EIR.*

a. *Is the EIR legally inadequate in not disclosing the criteria for determining water and sewer availability?*

In addressing this issue, a brief discussion of the operation of the "decision system" which is the heart of the Tuolumne County General Plan is appropriate. According to the plan itself, "The General Plan maps indicate the type, intensity and distribution of land use throughout the unincorporated portion of the County. . . ."

The general plan map contains eight major categories of land use designations: "residential," "commercial," "residential/agricultural," "resource," "open space," "industrially designated areas," "park and recreation," and "public/institutional/school." According to the general plan: "'Residential' and 'Resource' land use designations on the General Plan maps are determined through the use of a decision system . . . . The purpose of the decision system is to base General Plan map use designations on a coherent and clearly-defined set of criteria which are consistent with *General Plan* policies and are applied in a uniform fashion throughout the County. Two characteristics are automatically recognized on the General Plan maps and do not require the application of the decision system in arriving at a General Plan land use designation. Existing urban uses are shown on the General Plan maps as they presently exist. Likewise, lands which were rezoned under Ordinance 695 are given a General Plan land use designation which is consistent with their zoning classification under Ordinance 695 except in those instances where existing use is more intense. In cases where a property's existing land use is more intensive than its existing Ordinance 695 zoning, it has received a designation which is compatible with its existing land use. The decision system is therefore applied only to lands zoned under Ordinance 352. These (Ordinance 352) lands receive either the general plan designation indicated by the decision system or one which is compatible with their existing land use, whichever is most intensive."[2]

According to the plan the decision system operates as follows: "In applying the decision system, the initial determination that is made depends on whether the particular parcel being addressed is located within current public water and/or public sewer service areas. If it is, a number of additional factors are considered and appropriate designations are applied. These factors include the

[2]Ordinance 695 was enacted July 11, 1972.

existing zoning classification, average parcel size, relative degree of fire hazard, the rating for commercial timber potential or rangeland potential, whether any septic limitations are known to exist in the area, and contiguity to other urban, large-lot or resource areas."

Essentially, the decision-making process relies initially upon the availability of public water supplies and sewage disposal. If neither of these facilities is in or proposed, a lot size of from two acres per parcel to thirty-seven acres per parcel will be designated.

Appellant contends that because the operation of the decision system is based upon initial decisions concerning the availability of water and sewer services, the EIR is legally inadequate because it does not disclose criteria for determining water and sewer availability. We disagree.

The EIR extensively analyzes the "availability" of water supplies and sewage disposal. Chapter V of the MEIR documentation deals with the necessary infrastructure facilities (e.g., water supply facilities and sanitary sewage systems) needed for urban land uses. Introducing chapter V is the statement that "[i]nformation identifying present level of service, the currently available capacity to service growth, and facility deficiencies and constraints have been considered in designating land uses on the new General Plan." There then follows a detailed analysis of the public water sources from "tiny affiliations of a few individuals to large community service districts."

The MEIR documentation likewise thoroughly describes existing sanitary sewage systems. The two primary methods of sewage disposal, i.e., (1) individual sewage disposal systems (septic tanks), and (2) the six public sewage systems are described in detail.

The general plan sets forth in section VI County's commitment to provide adequate public services and facilities (e.g., water and sanitary sewers) to its residents. This commitment is expressed in the plan in the "public services and facilities" chapter by specific policies and suggestions for implementation of the policies.

Appellant argues that the initial determination as to water availability is based upon "will serve" letters issued by water purveyors. Thus appellant contends that these water agencies will dictate land use decisions. Appellant apparently misconceives the nature and purpose of such "will serve" letters in effect at the time of the approval of the EIR and the adoption of the general plan. The testimony at the trial in this action clearly established that such letters are, in effect, a commitment of service. Before such a letter is issued the applicant is required to agree to meet certain conditions, absent which, no "will serve" letters

will be issued even though the water purveyor has the willingness, capacity, or capability to serve. Hence, County's criteria is that water availability is positively required. The County has not in any respect abdicated its planning responsibility. In fact, some "will serve" letters have been rejected by County's staff for various reasons, e.g., "a proposal was premature and inappropriate," or certain conditional letters "were inadequate and insufficient."

It would appear that in attacking the EIR on the basis of "will serve" letters, appellant may be confusing the requirements of an EIR for specific projects with those applicable to an EIR prepared to analyze impacts of adopton of a general plan. The different degree of specificity required for each is recognized in California Administrative Code, title 14, section 15147: "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR.

"(a) An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan or comprehensive zoning ordinance because the effects of the construction can be predicted with greater accuracy.

"(b) An EIR on projects such as the adoption or amendment of a comprehensive zoning ordinance or a local general plan should focus on the secondary effects that can be expected to follow from the adoption, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow."

■ The EIR was sufficiently specific to inform the public and the governmental decisionmakers that land use determinations were initially predicated upon the determination of water and sewer availability. It may not have been exhaustive but it was an adequate, complete, reasoned analysis, and a good faith effort at full disclosure.

b. *Sufficiency of County's responses to comments.*

Appellant contends that certain responses of the County to comments upon the draft EIR are inadequate and do not meet the standards of CEQA and the implementing guidelines. Appellant therefore contends that the environmental impact report is inadequate.

The environmental impact report contains numerous letters and comments upon the draft EIR, received from individuals, organizations, and local and state agencies.[3]

---

[3]Written comments received on the draft MEIR appear in the MEIR at appendix B. Verbal comments received on the draft MEIR appear at appendix C and the County's responses to the comments raised in those written and verbal communications appears in the MEIR at appendix

In *Cleary* v. *County of Stanislaus, supra,* 118 Cal.App.3d 348, 355-357, this court discussed at length the County's duty to respond to substantial comments made on the EIR and the type of response which is mandated by CEQA. The court quoted extensively from *People* v. *County of Kern, supra,* 39 Cal.App.3d 830 [115 Cal.Rptr. 67]. ■ Because it appears to be a thorough and definitive discussion of this issue, that part of the *Cleary* decision is adopted here in its entirety: "An EIR is an informational document, the purpose of which is to provide the public and public agencies with detailed information about the effect which a proposed project is likely to have on the environment, to list ways in which significant effects might be minimized and to indicate alternatives to such a project. ([Pub. Resources Code,] § 21061; see *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 86.)

"Section 15146, subdivision (b) [of Cal. Admin. Code, tit. 14] states: '(b) The response of the Lead Agency to comments received may take the form of a revision of the Draft EIR or may be an attachment to the Draft EIR. The response shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections). In particular *the major issues raised* when the Lead Agency's position is at variance with recommendations and objections *raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted,* and factors of overriding importance warranting an override of the suggestions.' (Italics added.) (See Implementing Guidelines, §§ 15150, 15140, subd. (e), 15146, and 15147.)

"In *People* v. *County of Kern, supra,* 39 Cal.App.3d 830, 841-842, this court elaborated upon the requirements of the CEQA that legitimate and significant environmental impacts associated with the proposed development be fully, explicitly and specifically addressed in environmental impact reports. The court stated: 'This regulation, together with other regulations which touch on the point (see Cal. Admin. Code, tit. 14, §§ 15027, 15085 (a), (d), 15143 (b)-(e)) make it abundantly clear that in preparing the final EIR, the County must describe the disposition of each of the significant environmental issues raised and must particularly set forth in detail the reasons why the particular comments and objections were rejected and why the County considered the development of the project to be of overriding importance. The policy of citizen input which underlies the act (*Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* [*supra,*] 27 Cal.App.3d 695, 704-705 . . .) supports the requirement that the responsible public officials set forth in detail the reasons why the economic and social value of the project, in their opinion, overcomes the significant environmental objections raised by the public. In *Silva* v. *Lynn*

D, pages 1 through 40. The County's responses frequently refer to other parts of the general plan or the environmental impact report, and supporting documentation.

(1st Cir. 1973) 482 F.2d 1282, 1285, a case decided under the analogous National Environmental Policy Act (see *Friends of Mammoth* v. *Board of Supervisors* [1972] 8 Cal.3d 247, 260-261 . . .; *County of Inyo* v. *Yorty* [1973] 32 Cal.App.3d 795, 807 . . .), the court explained the policy thusly: "Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to crystallize issues [citation] but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.' [Citation.] Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response.*" (Italics added.) (See also *Environmental Defense Fund, Inc.* v. *Coastside County Water District, supra,* 27 Cal.App.3d 695, 704-705, 708; *Portland Cement Association* v. *Ruckelshaus* (1973) 486 F.2d 375, 392-394 . . . .) Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided, and only by this process will the public be able to determine the environmental and economic values of their elected and appointed officials, thus allowing for appropriate action come election day should a majority of the voters disagree.' (See also *People* v. *County of Kern* (1976) 62 Cal.App.3d 761, 769-774 . . .; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1974) 44 Cal.App.3d 158, 160 . . . .)"

The *Cleary* court held that certain responses of the county to the Air Resources Board and the Department of Food and Agriculture were nonspecific and general, and thus inadequate to answer the specific concerns of those agencies. However, the court did find that the response to the Department of Health, Office of Noise Control was adequate where the letter from the department expressed rather general concerns about the increased noise level which a commercial development would possibly produce, because the element of increased noise was considered in the draft EIR, and because the letter from the department raised no new issues. Therefore, the response made thereto by the County in the final EIR "when considered in conjunction with the draft EIR is sufficient." (*Id.*, at p. 360.) Moreover, the court held that letters received from individuals which raised no new environmental issue which the draft EIR had not recognized or which was not noted in the comment of the state agencies did not require response. (*Id.*, at p. 360.)

Appellant contends that the County's responses to specific comments on the draft EIR were inadequate. Appellant categorizes these comments under two general headings: water and resource protection policies.

*Water Policies.*

It is difficult to discern the main thrust of appellant's argument in this category because of a commingling of theories advanced as to EIR inadequacy with respect to (1) the lack of criteria to determine water availability, (2) insufficient responses to comments, and (3) the failure to incorporate mitigation measures into the general plan. The first theory already has been discussed at length and the third theory will be discussed subsequently. We will attempt to address the second theory separately although realizing that there necessarily will be some overlapping.

Appellant contends that the responses to three letters concerning the general plan's proposal to base the decision system for land use determination upon an initial categorization concerning the availability of public water and public sewage, were inadequate. These letters are designated numbers 6, 10 and 15 in the EIR.

*Letter number 6 by John Buckley* contained the comment that "[e]ven to blatantly allow small lots wherever public water will be provided gives planning power to the water companies, does not take into account the cumulative effect of such development if it would become widespread, and does not adequately explain how septic systems, traffic and public service problems will be met." No specific response to this comment appears in the response section of the MEIR.

*Letter number 10 by Glen F. Carrol* stated with regard to the general plan, "it also allows extension of water/sewer lines anywhere without approval of the planning agency. It should be subject to review by said body." The response appearing in the MEIR to this comment is "no comment necessary."

*The Twain Harte Homeowners Association in letter number 15,* suggests as a mitigating measure that the County "[r]equire a permit approved by the Board of Supervisors for [extension] or piping of water and sewer lines in Tuolumne County." This mitigation proposal was aimed at alleviating appellant's concern that "the plan allows extension of water and sewer lines anywhere in the county without the approval of the county planning agency. Once water and sewer lines are in urban development is allowed. This gives no direction to water and sewer districts and utility companies. In effect, the plan by its silence, allows these service entities to determine where growth will and will not occur . . . ."

This comment and the mitigation measure proposed by appellant Twain Harte appear to encompass the comment of the Carrol letter and at least partially encompass the comments contained in the Buckley letter. Therefore, if the response to this letter is considered adequate, failure of a specific response to

the letters numbers 6 and 10, which are merely cumulative, would not cause the EIR to be inadequate. (See *Cleary* v. *County of Stanislaus, supra,* 118 Cal.App.3d 348.)

The County's response to the proposed mitigation measure in the Twain Harte letter is as follows: "County officials and local service agencies should coordinate their planning activities. However, it is probably outside the County's legal authority to dictate which areas water purveyors may or may not serve. Public utilities, for example, have legal service districts within which they *must* provide hook-ups regardless of the County's planning preferences (See ref. 6 page V-5 Public Utility Company, for mandatory service requirements) [referring to MEIR Documentation]." The response to the comment concerning abdication of planning responsibility to service agencies is, "Comment on the policy content of the MDGP: no response is necessary."

However, the County's response to a comment by Margaret K. Sylva (letter No. 16) also addresses these issues as follows: "On June 27, 1980, the general plan consultant sent letters to each of the water or sewer agencies whose capacity of hook-up data you (or other people) queried. Appendix I contains copies of these survey letters along with a list of agencies to whom these letters were sent. Agencies who responded to the consultant's June 27 letter are indicated with a check ( ✓ ). [¶] Tables V-1 and V-2 have been revised to reflect the data provided by these agencies. Copies of these tables appear in Appendix E of this report."

Such responses are adequate because they disclose that the effect of the operation of the EIR decision system is in accordance with appellant's observations that land use determinations initially are to be made upon the availability of water and sewage services.

The issue then is primarily the degree of specificity required in a response to comments on the general plan and the EIR. Respondent County has certainly provided more than adequate information regarding water and sewer facilities and services and has disclosed the manner in which it obtained information about the availability of water and sewage facilities and services. Hence, the responses of the County disclosed to the populus the impact of the County's choice to make an initial determination as to urban or nonurban designation upon the availability of water and sewage facilities. The adequacy of the EIR in respect to the determination of such availability has been previously discussed.

Appellant further contends that the EIR not only fails to respond to comments concerning the water supply of the County, but that it contains a misrepresentation when in response to a query of *Glen F. Carrol contained in letter number 10* asking, "Is it true that urban development will be allowed on any private

land where water services are available—except Williamson Act and timber preserve?", respondent answered in pertinent part as follows: "In order to receive a multifamily residential or commercial general plan designation, the parcel must be served by both *public water and public sewer* systems as well as meeting locational criteria." Appellant contends that this response is misleading because the general plan discloses that "[n]ew commercial development will be served by public water and public sewer systems. In situations where a public sewer will not exist in the foreseeable future, certain commercial uses may be permitted subject to a Conditional Use Permit and approval of the Tuolumne County Health Officer. Self-contained commercial developments *may be permitted* outside of existing water districts, P.U.C.'s, mutuals, and service districts upon proof of water availability and completion of an approved water system in lieu of 'public water.'" (Italics added.) Thus, appellant contends that the EIR is incorrect. However, because the comment refers to "urban development" and in fact the exception to the public water requirement occurs in "commercial" designations (even though commercial may be considered a subset of urban) it does not appear that this misrepresentation is in fact a substantial one or that it would mislead the public, particularly in view of the fact that the commercial exception appears in the general plan itself.

*Resource Protection Policies.*

Appellant contends that responses to comments regarding resource protection were inadequate. Appellant contends specifically as follows:

1. *Comment contained in Twain Harte Homeowners Association letter 15,* "[t]he plan contains policies and statements to maintain natural resource lands important for industries such as timber, agriculture and mining. . . . However, there is no implementation for these policies and they are inconsistent with implementation in appendix A. [The 'decision system'.] There is no protection for these industries when densities of 6 units per acre are allowed anyplace in the county where water and sewer are provided. (Appendix A.) This lack of implementation and inconsistency will result in a significant adverse impact on the timber, mining and agricultural industries as well as the recreation industry and the natural environment."

County responds to this comment as follows: "The *MDGP* permits urban development to occur in areas that are served by both public water and public sewer systems, except in areas where hazards or limitations are known to occur (ref. 5, p. A-1). See response to comment 11-7 for a discussion of the impact associated with public facility expansion policies." The referenced comment to public facility expansion policies is as follows: "The provision of public facilities such as roads and public water systems can play a major role in influencing the timing and location of development. Without these facilities, ur-

ban development in most cases cannot occur. Conversely, extension of public facilities into an undeveloped area can create or stimulate pressures for development earlier than would otherwise occur. These demands can undermine and ultimately overwhelm any land use regulations which may have sought to preserve open space or achieve a logical sequence of contiguous development. Consequently, public policies for public facility expansion can be used either to promote urban sprawl or to control urban development and reduce the unnecessary economic, social and environmental costs of sprawl." Thus, the plan appears to admit that development according to the decision system could have a severe impact upon the agricultural, mining and forest industries. (The County acknowledges in the EIR that rangeland which is subdivided into 5-, 10-, or 20-acre parcels is generally considered to have little or no remaining commercial range value.) Appellant contends that the discussion or response to the criticism of the drastic effect of the plan upon timber, mining and agricultural industries within the county is inadequate.

Although appellant contends that there is no discussion or analysis in the EIR of the number of parcels that would be permitted under the previous general plan and the number and location of those parcels that can now be subdivided under the decision system proposed in the new general plan, the MEIR at appendix F sets forth a breakdown of the number of acres which are allocated in the various land use categories proposed in the general plan. Moreover, appellant points to no statutory requirement that the EIR must contain a comparison between the current zoning or land use allocation and that proposed under the general plan.

On appeal, County's only contention with regard to the adequacy of its response to comments concerning resource protection is that "no planning responsibilities have been abdicated." County contends that the designations appearing in the general plan are based on the best information available at the time and subject to alteration as inaccuracies are identified. County also contends that timber and mining are provided for in the general plan at page III:11 [implementation—conservation and resource preservation]. That section provides in pertinent part that the existing zoning ordinance (695) should be modified to achieve consistency with the general plan, which will require additions to or revisions of the zoning to reflect adequately the intention of the general plan's open space, agricultural resource, and timber resource map designations and policies. Further reference to agricultural values in that section occurs in paragraph B which states: "Permit agricultural and recreational uses in open-space flood and active fault areas if it can be demonstrated that additional flooding, drainage or hazards will not result." Discussion of mineral resources occurs at paragraph C as follows: "Designate each area shown as 'Natural Resources' on the Geotechnical Interpretive maps as a resource overlay zoning district. Require development proposals in these districts to

evaluate the quantity and quality of the potential rock and mineral resource(s). If the resource is determined to be valuable, require the development to be designed in a manner which does not preclude the future utilization of the resource."

It is apparent that such comments do not fully respond to appellant's remarks in connection with the impact of the decision system upon the timber, mining and agricultural industries within the County.

2. However, the response to similar concerns expressed in *Tina Deatsch's letter number 11* are sufficient and rectify this inadequacy. The Deatsch letter inquires "What will the significant adverse impacts and cumulative impacts of designating lands for five acre lots be on: [¶] (a) land so designated? [¶] (b) adjacent land? [¶] (c) the private land area of the county as a whole? [¶] (d) economically valuable natural resources such as timber, agriculture, minerals, wildlife and recreational open space?" The County's response is set out in the MEIR as follows:

"The rural residential designation, of which five acre lots are a component, functions as an intermediary or buffer between the large-lot agricultural (range and timberland) areas and the more urban (estate and single-family) residential areas. It affords residents the opportunity to live near agricultural areas in a 'ranchette' type of environment, thus serving as an integral component in the spectrum of housing types and densities provided by the *MDGP*.

"Add the following environmental impact to page 15 of the *MEIR* after line 30:

" 'The rural residential designation permits the subdivision of extensive portions of the county . . . into parcels which have little or greatly diminished resource production capabilities. Rangeland which is subdivided into 5, 10 or 20 acre parcels is generally considered to have little or no remaining commercial range value. Similarly, under the County's current ordinance, commercial timber harvesting is not permitted on 5 acre parcels.'

"Add the following socio-economic impact to page 17 after line 14:

" 'Development at "rural residential" densities significantly reduces the resource potential of the subdivided land while, at the same time, affords relatively few housing opportunities. For example, if a parcel of 40 acres of land is developed at rural residential (5-acre) densities, it would only house approximately 18 people. [Fn. omitted.] If, on the other hand, the same 40 acre parcel has the services necessary to enable it to be developed at single-family residential densities, it could provide housing for approximately 480 people [fn. omitted] or 2,670 percent more people than at rural residential densities.'

"Also see responses to comments 4-2 and 7-4."

Response to comment 4-2 essentially recognizes that "smaller minimum parcel sizes generally lead to denser human populations and greater wildlife losses." The response to comment 7-4 discusses the economic dependency of the County on the timber industry and that that industry is "clearly dependent on the continued preservation and management of the County's commercial timber resources." The response continues "When timber resources are lost through development, some of the base sector employment losses in the timber industry can be offset with increased levels of emloyment in the construction industry. In the long run, however, this shift in employment does not counteract the negative impacts associated with losses in the timber industry because of the following: [¶] The timber industry is based on a renewable resource and therefore provides *continued employment* as opposed to the construction industry which provides employment on a project-by-project basis. [¶] Historically, the county's manufacturing sector has remained fairly stable while employment in both the construction and tourism industries have been rather cyclical going through boom and bust periods as a result of changing weather, financial or economic conditions. [Citation.]"

Thus, this response does indicate some of the deleterious effects of designating land for five-acre lots. Appellant contends that the response is insufficient because it overlooks the critical aspects of subdividing lands adjacent to actively producing natural resource industries, i.e., problems associated with the use of agricultural herbicides and pesticides in areas of residential development, problems of conducting mining operations, including blasting and truck traffic near residential housing, and questions of conducting timber operations in a watershed being converted to two- and five-acre parcels. Appellant argues that nowhere does the EIR address these concerns. On the other hand, the EIR does indicate that rural residential densities may serve to act as a buffer zone between such uses. The question here is essentially how specific the EIR is required to be, in the absence of any comment which directs the County to address these relatively specific questions. These questions do not appear to have been raised by any of the comments or suggestions for changes in the EIR or general plan prior to their adoption by the County.

In order to address the above mentioned problems and to alleviate their impacts appellant included in its letter (No. 15), a number of proposed mitigation measures. Appellant contends that the proposals were neither incorporated into the project nor did there appear any explanation as to why such mitigation measures were not appropriate.

The letter recommends as a mitigation measure that the County "[d]esignate lands which are valuable for timber, agriculture, and mining as large lot. This

designation would have priority over urban use in Appendix A. regardless of whether [water] and sewer is available." In response to this comment the County stated, "The benefits of the proposed mitigation measure may be offset by the adverse socio-economic impacts associated with having public water or sewer capacity which cannot be utilized. This is a policy decision which must be made by the Board of Supervisors." Appellant contends that the EIR failed to discuss whether the impact of having underutilized sewer or water capacity is in any way a reality.

With regard to the adequacy of the response to this proposed mitigation measure, it appears that the board of supervisors in adopting their decision system made a policy decision between expanded urbanization and protection of resources. Such decision should not be second-guessed by this court, as to do so would be to probe the "merits" of the plan.

The determination of the sufficiency of County's responses to comments upon the draft EIR turns upon the detail required in such responses. In evaluating the adequacy of an EIR for a proposed airport expansion, the evaluation of environmental effects of the proposed project need not be exhaustive. ■ The sufficiency of the EIR is to be viewed in light of what is reasonably feasible. Courts should look for adequacy and completeness in an EIR, not perfection. (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) "While the decision makers must take account of environmental objections [citations], satisfactory answers to these objections may be provided by reference to the EIR itself [citation]." (*Ibid.*) The court in *San Francisco Ecology Center* v. *City and County of San Francisco, supra,* facing a similar issue concluded: "The final EIR must include the responses of the proponent agency to significant environmental points raised in the review and consultation process. (Cal.Admin.Code, tit. 14, § 15146.) Appellants contend that the responses were inadequate; but the final EIR responded to objections relating to noise, air pollution, traffic problems, growth-inducing impact and tax burdens on San Francisco residents. While the responses were not exhaustive, they do evince good faith and reasoned analysis. (See *People* v. *County of Kern, supra,* 39 Cal.App.3d at p. 842.) We cannot say that the trial court erred in concluding that the EIR was adequate." (*Id.,* at p. 596.)

■ In the instant case it does appear that the County responded fully and adequately to comments in numerous instances and that they addressed in great detail many of the issues raised by appellant. The responses as a whole evince good faith and a reasoned analysis, despite the fact that the responses are not exhaustive or thorough in some specific respects. They adequately serve the disclosure purpose which is central to the EIR process.

Consequently, this court finds that there is substantial evidence with respect to the document as a whole that the numerous comments made were responded to by the County in an adequate manner.

c. *Mitigation measures.*

Appellant complains of the purportedly unexplained failure to include in the final general plan mitigation measures found to be feasible in the EIR, specifically those set forth at pages D-6, D-11, D-18,[4] and D-33 of the MEIR.

*The mitigation measure proposed at page D-6* reads as follows: "Add the following mitigation measure after line 23 on page 20:

" 'Protect wildlife habitats by changing *MDGP* policy 3 on lines 3-4 to read: ". . . such as the riverside riparian communities along the Stanislaus and Tuolumne rivers and *other critical wildlife habitats.*" ' "

*The mitigation measure proposed at page D-11* reads as follows: "Add the following mitigation measure to page 20 under line 23: [¶] 'Place existing domestic wells in "limestone areas" under a quarterly bacteriological sampling program to assure that the public now residing in those areas is receiving safe and potable water.' "

*The mitigation measure proposed at page D-33* reads as follows: "Add the following mitigation measure to page 21, line 24 of the MEIR [¶] 'Adopt park standards which establish per capita parkland requirements and specify the types of facilities that county parks should contain.' "

The precise language of the above mitigation measures which were contained in the EIR and were proposed to be added to the master draft general plan do not appear, at least in the language utilized in the EIR, in the final general plan.

Public Resources Code section 21002 provides as follows: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant

---

[4]*The mitigation measure proposed at page D-18* related to reclassification of timberland on the Alvantis scale. It was admitted by respondent that the omission of this mitigation measure was an oversight and it was specifically addressed by the trial court in issuing its writ of mandate to require the board to reconsider its inclusion in the final general plan. It need not be considered by this court.

effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof." Public Resources Code section 21081 states in pertinent part: "[N]o public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings:

"(a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental report.

". . . . . . . . . . . . . . . . . . . .

"(c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

The notice of determination filed by the board on September 2, 1980, contains the required finding that, "All mitigation measures recommended in the Final Environmental Impact Report were included in the project as approved." Moreover, the trial court found that, "Mitigation measures proposed in the final environmental impact report were included in the adopted new general plan."

Respondent contends, and Planning Director Nuzum testified at trial, that the specific mitigation measures, with the exception of the erroneously omitted timber mitigation measure, were contained in the general plan as specific policy statements.

It is contended by County that those policy statements numbers 3, 4, 5 and 6 located at page III-2 of the general plan contain the essence of the *mitigation measure proposed at page D-6* relating to wildlife habitats.

The only specific reference therein to protection of wildlife habitat appears in policy statement 3 which provides in pertinent part that the County "will act in such ways as to preserve natural resource and wildlife habitat areas . . . ."

With regard to the *mitigation measure proposed at page D-11* relating to bacteriological sampling of domestic wells located in limestone areas, it is contended that the mitigation measure was included in policy statement 18 at page III:6 of the general plan. That policy statement reads in pertinent part that, "prior to development in limestone areas, the County of Tuolumne will require

a groundwater investigation and a report to be filed with the county which emphasizes the effects of the development upon the water quality. The County may also require wells to be monitored in these areas to ensure that there is no degradation of the groundwater."

Although not specifically requiring quarterly bacteriological sampling as stated in the EIR, it appears that this mitigation measure at least substantially incorporates the proposal, although lacking the "teeth" of the mitigation measure specified in the MEIR.

With regard to the *mitigation measure relating to park standards,* County contends that such mitigation measure was incorporated in the general plan, however, it fails to cite to a specific section. At trial Planning Director Nuzum testified that although the precise language proposed as a mitigating measure was not incorporated into the general plan, "The General Plan does refer to park standards, and part of the implementation of that General Plan would be an ordinance that did spell out that language." References to park and recreation facilities appear in the general plan at VI:3 and VI:5 as follows:

"11. Parks and recreation facilities of varying size, function, and location will be provided to serve county residents.

"12. Developers of new residential subdivisions of 100 units or greater will be required to dedicate land and/or pay fees in lieu of dedication for the acquisition and development of recreation facilities which directly serve the needs of the subdivision." (VI:3.)

"J. Whenever possible, acquire future park sites prior to the urbanization or development of an area in order to conserve park acquisition monies. These sites could be leased for agricultural or other uses until park development is required and programmed.

"K. Prepare a Five-Year Capital Improvement Program (CIP) listing the necessary improvements to the County of Tuolumne's public services and facilities for which funding will be provided." (VI:5.)

It appears that nowhere in the plan is there a requirement that the County at some point adopt park standards to establish per capita parkland requirements and specify the types of facilities that county parks should contain.

The trial court found that proposed mitigation measures listed in the EIR at pages D-6, D-11 and D-33 had been incorporated into the general plan. Therefore, it must have concluded that these general policy and implementation

guidelines were sufficient to incorporate the more specific mitigation measures proposed.[5]

Neither party has directed the court's attention to any cases dealing with the question of whether a mitigation measure proposed in the environmental impact report to be incorporated in the general plan must be *literally* incorporated into the plan or the degree to which general policy statements may be deemed to have incorporated specific mitigation proposals. ■ We hold that literal adoption of such proposed mitigation measures into the general plan is not required. We find that there is substantial evidence with respect to the general plan as a whole supporting respondent's determination, as well as the trial court's finding, that all mitigation measures recommended were included in the final project as approved.

d. *Whether changes to the general plan adopted by the board of supervisors on August 18 required additional environmental analysis under CEQA.*

Appellant contends that significant changes were made in the general plan on August 18, 1980, at the same meeting wherein the board adopted the final EIR and that such significant changes were never formally analyzed under the procedures mandated by CEQA.

California Administrative Code, title 14, section 15067 provides in pertinent part that "Where an EIR or Negative Declaration has been prepared, no additional EIR need be prepared unless: [¶] (1) Subsequent changes are proposed in the project which will require important revisions of the EIR, *due to the involvement of new significant environmental impacts not considered in a previous EIR on the project.*" (Italics added.)

Thus, it appears that if changes adopted at the August 18 board meeting would involve new significant environmental impacts that had not been considered in the previous EIR on the project, a new EIR or a supplement to the adopted EIR would need to be prepared. By the same token, if the environmental impacts of the proposed changes were not significant or, if the existing EIR adequately addressed the significant impacts likely to occur as a result of adoption of the changes, a new EIR need not be prepared.

---

[5]To some extent the problem of determining whether in fact the mitigation measures were properly incorporated into the general plan (as attested to by the notice of determination and as found by the trial court), is exacerbated by the fact that this court apparently does not have before it the original draft general plan which was circulated for comment. We therefore do not know whether in fact the policy statements and implementation measures which are purported to incorporate the proposed mitigation measures in fact do so or whether they were in the draft as circulated and have merely been retained without incorporation of the additional measures. It does appear with regard to the mitigation proposal recommending quarterly bacteriological testing of water in limestone areas, that the policy statements set forth at page III:6 of the general plan were adopted in response to the proposed mitigation measure.

Government Code section 65356 sets forth a procedure whereby amendments or modifications in the general plan or any part or element thereof can be considered by the legislative body and provides that any previously unconsidered modification to the proposed plan shall be first referred to the planning commission for a report and recommendation. Public hearings need not be held by the planning commission on the proposed change.

It appears that the board of supervisors complied with this procedure by referring adopted changes in the draft general plan to the planning commission for review.

The changes in the draft general plan which were adopted by the board and referred to the planning commission for analysis at the August 18 meeting and which appellant charges were significant were as follows:

(1) Page 13, paragraph 13, was deleted. (II:4, general plan.) Former paragraph 13 had provided that: "Due to seasonal weather and road conditions, heavy industrial development, with the exception of mines and forest products facilities, will not be permitted northeast of Mono Vista."

(2) On page 18, line 18, the word "contract" was inserted between "Williamson Act" and "Lands" and the word "unnecessary" was inserted before the word "development" so that the final general plan provision reads as follows: "The economically important forest resources in Tuolumne County such as TPZ and Williamson Act *contract* Lands will be protected against *unnecessary* development." (III:2, general plan, italics added.)

(3) On page 18, line 21, the board added the word "premature" between the words "against" and "subdivision" so that the provision reads as follows: "Economically important range land in Tuolumne County will be protected against *premature* subdivision and development." (III:2, general plan, fn. omitted, italics added.)

(4) On page 20, line 13, the existing general policy number 12 was amended to insert the words "critical-use and high occupancy" between the terms "proposed" and "structures" to read as follows: "Ground shaking associated with a major earthquake along the Foothills Fault Zone will probably affect the entire county. Therefore, the County of Tuolumne will ensure that existing and proposed *critical-use and high occupancy* structures are designed and built to withstand the maximum credible earthquake (as defined in Policy 10) with reasonable safety and without collapse." (III:4, general plan, italics added.)[6]

---

[6]General policy No. 12 originally referred, apparently erroneously, to policy 9 whereas general policy No. 12 as amended correctly refers to policy 10.

(5) On page 23, paragraph 23 the underlined sentence was added to the following policy: "Urban or clustered development will be acceptable in moderate fire hazard areas in order to maximize the efficiency and effectiveness of fire protection services in the county. Areas identified as 'high fire hazard' on the map will be reviewed by the planning staff to determine the true extent of the potential hazard. If the hazard is found to be less significant or if it can be reduced by making improvements in compliance with a hazard reduction plan, the area may be developed pursuant to applicable general plan policies." (III:7, general plan, emphasis added.)

(6) Finally, appellant challenges the insertion on page 44, line 18, of the words "outside of existing water districts, PUC's, mutuals and community service districts" to the policy relating to commercial development as follows: "New commercial development will be served by public water and public sewer systems. In situations where public sewer will not exist in the foreseeable future, certain commercial uses may be permitted subject to a Conditional Use Permit and approval of the Tuolumne County Health Officer. Self contained commercial developments may be permitted *outside of existing water districts, P.U.C.'s, mutuals and service districts* upon proof of water availability and completion of an approved water system in lieu of 'public water'." (V:3-4 general plan, italics added.)

Appellant alleges that each of these changes will result in significant environmental impacts and that they therefore must be analyzed under CEQA. Although appellant contends that following the revisions, one could reasonably expect that, pursuant to guidelines for implementation of CEQA, an initial study would be prepared by the planning department to analyze whether a negative declaration or an EIR was appropriate (see Cal. Admin. Code, tit. 14, § 15080), it does not appear that such is a necessary procedure.

In the instant case, an EIR already existed and had been adopted pursuant to the regulations set forth in the Administrative Code and according to the procedures set forth in Public Resources Code section 21100 et seq. Because the EIR already existed, unless there would be a significant effect from the proposed change, which impact had not already been addressed in the EIR, neither a public hearing nor an oppportunity to comment on the changes prior to issuance of a negative declaration or adoption of a supplemental EIR is required. The County could and did, pursuant to California Administrative Code, title 14, section 15067, find that the existing EIR adequately addressed the issues raised in the amendments. This was the testimony of County Planning Director Nuzum at trial.

The trial court found that, "The environmental impacts of changes made in the general plan after the final environmental impact report was certified were

analyzed by respondents prior to the final adoption of the new general plan and all of the changes made were covered in the final environmental impact report."

Testimony of Planning Director Nuzum at trial was essentially that the changes adopted by the board on August 18 were proposals for changes and that the planning staff analyzed the proposals for changes to determine whether they had a significant impact and whether they were covered by the existing EIR. Nuzum testified that where proposed changes were significant and not covered by the EIR they were not adopted.

For convenience, the individual changes in the general plan will be discussed in the same numerical sequence as previously set forth.

(1) It does not appear that there is any explanation or discussion of the impact of deletion of the provision relating to refusal to permit heavy industrial development northeast of Mono Vista, with certain exceptions. This court cannot determine whether that deletion would have a substantial impact, although it appears that it might have a very substantial impact. There appears to be no discussion of this deletion from the general plan which would enable us to say that there was no substantial impact or that the issue of development north of Mono Vista was adequately covered in the environmental impact report. Hence, it should have been further analyzed in the EIR.

(2) The effect of the insertion of the word "*contract*" in the "Williamson Act contract Lands" provision was to "clarify the distinction between lands that were in a preserve established under the Williamson Act, but not under a Williamson Act contract from those lands that were both in a preserve and . . . under a contract." Nuzum stated that the reason the change was made was not to reduce the amount of land to be preserved from development, but to clarify the original intent.

The term "*unnecessary*" with regard to protecting forest resources against "unnecessary development," which appellant contends changes the entire thrust of the paragraph from protecting forest resources against all development to protecting them from "unnecessary" development, was apparently contained in the original draft of the general plan. According to Nuzum the planning commission took the word out and the board reinserted it. Where the word had been initially present in the original general plan, Nuzum contended that there was no change in the final general plan.

With respect to protection of Williamson Act contract lands from "unnecessary" development, Nuzum further testified that, "It was felt that the stipulations in the Williamson Act contract define what is consistent or ap-

propriate development and thereby stating what is unnecessary and that was the feeling, that limitations of the contract were sufficient to define unnecessary development.''

(3) The term "premature" (with regard to protection of natural resources from premature subdivision and development) was contained in the original draft of the general plan. According to Nuzum the planning commission took the word out and the board reinserted it.

Nuzum further clarified that when the board reinserted the term "*premature,*" the board "felt that the premature subdivision and the controls were included in the other policies in the Plan relating to the expansion of urban areas and urban development and that they adequately, depending upon the extension of water and sewer, so forth, that those were adequate, they would be premature without those infrastructure extensions.''

(4) With respect to the seismic safety amendment, Nuzum agreed that the protection provided in policy 12 to existing and proposed structures throughout the county was limited by the amendment to apply only to existing and proposed *critical-use* and *high occupancy* structures. Review of the general plan submitted to the board prior to their adoption of the proposed changes, shows that the plan did specify that the county would require "critical-use and high occupancy structures" (defined in appen. C to the general plan) to be designed and built "to retain their structural integrity when subjected to probable ground accelerations generated by the design earthquake.''

It is apparent that this is a substantial change as it would not require that the vast majority of structures, including most commercial and industrial buildings, small hotels, apartment buildings and single family residences be so protected. This change in the seismic safety element to provide that only high occupancy and critical-use buildings need withstand the maximum critical earthquake would appear to have a substantial impact, and should have been further analyzed in the EIR.

(5) Nuzum also testified with respect to the proposal to allow the planning staff to review areas defined as *high fire hazards* on the map to determine the true extent of the potential hazard and, if the staff determined the hazard to be less significant than designated or that the hazard could be reduced, to allow development pursuant to applicable general plan policies. Nuzum testifed that fire hazard areas are classified by the State of California, Division of Forestry. "[B]ecause of the fact that there are certain changes that take place they are perhaps basing extreme category on the fact that it is a dirt road in poor condition and it's possibly—since that designation has been given, the road has been graveled or paved or a fire hydrant may exist or some other thing may have

taken place. [¶] Therefore, what this says is, that in those areas an investigation will be made to determine if there has been a change in circumstance that warrants a reduction in that classification or if it is possible by doing one of those things, extending a road, a waterline, clearing brush, if it may be possible to in effect reduce the fire hazard so that the word 'extreme' would no longer be applicable." Under this justification, it does not appear that the impact of the change would be significant or that the impact was not covered under the existing EIR.

(6) Nuzum testified with respect to *commercial developments* occurring outside an existing district as follows: "The impact of that change is, that because basically the County has something like 92 or 93 separate mutual water districts, that in effect you would have to become a part of their system and qualify for public water unless you were clearly outside of the boundaries of one of those existing districts." The thrust of this testimony appears to be that the change was not significant because in fact under the existing policy it was assumed that the self-contained commercial developments would have to be located outside the existing water and sewer district in order to be able to develop an approved water system in lieu of "public water." Had they been within the district boundaries, the commercial developments would have had to become a part of the water system and would have to qualify for public water. Therefore, it does not appear that the change was in fact a significant change from the policy as originally drafted, but was rather a clarification.

Appellant counters these explanations by Nuzum concerning the changes by stating that the environmental impact report does not address the impact of the changes. Appellant also contends that because the EIR had already been adopted as the final and completed EIR for the plan on the same day that the amendments were made to the general plan by the board, the planning director's testimony as to the review of the proposed amendments was at best a "post hoc justification" for the board's action.

However, this latter argument ignores the fact that the regulations and the statute allow amendment of a general plan without requiring a new EIR where it is determined that the proposed changes are not substantial or that the changes are already covered by the existing EIR. (Pub. Resources Code, § 21166; Cal. Admin. Code, tit. 14, § 15067.)

Moreover, the Government Code specifically recognizes the procedure whereby the board refers proposed modifications back to the planning commission for analysis. The fact that the EIR had already been adopted does not negate these practices as one could assume that if the requirements of the regulation were not met and the changes were considered to be substantial and

not covered by the existing EIR, a new EIR or a supplement to the EIR would have to be prepared.

In the present case, this court finds that substantial evidence supports the board's and the trial court's determination that the EIR already covered the proposed changes (or by inference that the proposed changes were not substantial) for the changes numbered herein (2), (3), (5) and (6). However, County's contention that changes herein numbered (1) regarding Mono Vista and (4) regarding seismic safety, are incorporated into the general plan is not supported by substantial evidence.

### e. *Conclusion.*

With two exceptions the County's certification and approval of the EIR is "supported by substantial evidence in the light of the whole record." The two exceptions are the County's action (1) in deleting the provisions relating to refusal to permit, with certain exceptions, heavy industrial development northeast of Mono Vista, and (2) in amending general policy No. 12 with respect to seismic safety. The making of these changes in the general plan without further analysis in the EIR, constituted an abuse of discretion by County.

### 2. *The General Plan.*

#### a. *Land use element.*

Appellant contends that the general plan fails to meet statutory requirements in several of its elements. Initially, appellant contends that the land use element of the general plan does not comply with statutory requirements of Government Code section 65302, subdivision (a).

Section 65302, subdivision (a), provided in 1980 that a general plan mandated by section 65300: "shall include . . . [¶] A land use element which designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, and enjoyment of scenic beauty, education, public buildings and grounds, solid and liquid waste disposal facilities, and other categories of public and private uses of land. *The land use element shall include a statement of the standards of population density and building intensity* recommended for the various districts and other territory covered by the plan. . . ." (Italics added.)

The initial task faced by this court in determining the adequacy of the land use element is to determine the meaning of the terms "population density" and

"building intensity." These terms are not defined in the relevant statutes, regulations or guidelines. The parties have cited no authority to assist this court in determining what the statute requires in this regard.

The general plan states "densities" for "urban residential" uses in terms of the maximum number of "dwelling units per gross acre." With respect to nonurban designations of "residential/agricultural," and "resource" lands, densities are stated in terms of minimum lot sizes.[7] No densities are provided for areas designated "commercial," "open space," "industrial," "park and recreation," or "public/institutional/school."

In *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334 the court held that the land use element of the Mendocino County General Plan was invalid, but did not discuss the meaning of the terms "population density" or "building intensity." In *Camp,* figures of population density were stated for only two "areas" whereas several areas were classified and described in the general plan. According to the court, a table in the plan recited "density standards" of population in terms of "persons per square mile," but the figures were tabulated for each of four "land use categories" which did not apparently relate to the classified types of "area" which were described and mapped in the general plan. Nor did the descriptions of the "areas" appear to have any connection with the "land use categories" for which density standards were stated. Therefore, the court found that it was impossible to relate any tabulated "density standard" of population to any location in the county. Moreover, the court found that the general plan "states nothing at all of 'building intensity' standards in any of the classified types of 'area,' nor in any of the tabulated but undescribed 'land use categories,' nor at any location in the County." (At p. 350.) For those reasons, the court held that the land use element was not in substantial compliance with the requirements of section 65302, subdivision (a).

The County contends in the instant case that the measurement of dwelling units per acre meets the requirement for a statement of standards for population density and that the omission of a statement of population density for "commercial," "industrial" and "open space" land use designations reflects the fact that no residential development is permitted on those lands.

---

[7]In appendix B to the general plan (which cross references the location of the contents of the mandated elements) density components of the land use element are stated to be located at chapter I: 4-5 and IV: 5-6. At chapter I: 4-5 it does appear that densities are listed for "urban residential" (ranging from an average density of 6 dwelling units per gross acre maximum to 15 dwelling units per gross acre maximum) and for "nonurban" designations of "residential/agricultural" (ranging from a 2-acre minimum to 37-acre minimum) as well as for "resource" land ranging from 37-acre minimum for agricultural and range land to 67-acre minimum for timber. (These densities are repeated at IV: 5-6.)

In a planning context, statements of population density might reasonably be related to residency rather than to the extent of intensity of use of all classifications.

For census purposes "population density" has been calculated as "the number of persons per square mile of land area . . ." and "[e]ach person enumerated was counted as an inhabitant of his usual place of abode . . . ." (U.S. Dept. of Commerce, Bureau of the Census, 1970 Census Users' Guide (Oct. 1970) at p. 93.)

Cases in the zoning context have referred to measures of population density in terms of numbers of people per dwelling unit. (See *Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 19 [39 L.Ed.2d 797, 810, 94 S.Ct. 1536] (dis. opn. of Marshall, J.).)

The term "population density" has also been used to refer to maximum numbers of people living in a residential development. (See, e.g., *Trinity Episcopal School Corporation* v. *Romney* (S.D.N.Y. 1974) 387 F.Supp. 1044, 1080.)

Confronted with the requirement of subdivision (b) of Government Code section 65302 that the circulation element must be "correlated" with the land use element, it would not be unreasonable to interpret the term "population density" as relating not only to residential density, but also to uses of nonresidential land categories and as requiring an analysis of use patterns for all categories.

Given the variety of legitimate ways of interpreting the term "population density," it appears sensible to allow local governments to determine whether the statement of population standards is to be tied to residency or, more ambitiously, to the daily useage estimates for each land classification.

It could be argued that in the planning arena standards of population density might most usefully be stated in terms of dwelling units per acre where some relationship between an average number of people per household has been established and where distinctions based upon factors such as the size and type of dwelling (e.g., single family residences, multiple family residential, mobilehome) are supported in the plan.

Nevertheless, we cannot believe that the Legislature intended the terms "population density" and "building intensity" to be synonymous. ██ It is a well established principle of statutory construction that "[t]he courts presume that every word, phrase, and provision of a statute was intended to have some meaning and perform some useful function . . . ." (58 Cal.Jur.3d, Statutes,

§ 105, p. 480.) "A construction implying that words were used in vain, or that they are surplusage, should be avoided." (*Id.*, at pp. 480-481, fns. omitted; *Morro Hills Community Services Dist.* v. *Board of Supervisors* (1978) 78 Cal.App.3d 765, 773 [144 Cal.Rptr. 778].) In addition, "where different words are used in the same connection in different parts of the statute, it will be presumed that the legislature intended different meanings." (58 Cal.Jur.3d, *supra*, at § 127, p. 521, fn. omitted.)

 It appears that the reasonable interpretation of the term "population density" as used in Government Code section 65302 is one which refers to numbers of *people* in a given area and not to dwelling units per acre, unless the basis for correlation between the measure of dwelling units per acre and numbers of people is set forth explicitly in the plan.[8]

In the instant case, no statement relating dwelling units to numbers of people is presented in the general plan. Thus, we conclude that appellant's land use element is deficient insofar as it lacks an appropriate statement of standards for population density based upon numbers of people.

With respect to the requirement that the land use element must contain a "statement of the standards of . . . building intensity recommended for the various districts and other territory," there is no statement of building intensity for uses designated in the plan as "commercial," "residential/agricultural," "open space," "industrial," "park and recreation" or "public/institutional/ school." At most, the "urban residential" designation with its statement of maximum dwelling units per acre is the only land use designation with any building intensity standard. Minimum lot sizes set for "residential/agricultural" and "resource" areas are not sufficient as a statement of a building intensity. Nor are general use captions such as "commercial-neighborhood," "commercial-shopping center," "commercial-visitor serving," "light industrial" and "heavy industrial," which provide only the vaguest picture of the intensity of development to be permitted in those areas and provide no standards at all as to possible restrictions such as height or size limitations, restrictions on types of buildings or uses to be permitted within a designated area. We therefore conclude that the land use element of the Tuolumne County General Plan does not comply with the requirements of Government Code section 65302 as it fails to set forth an adequate statement of standards of population density and building intensity recommended for the various districts and other territory covered by the plan.

---

[8]We are aware of table VIII-23, "Residential Carrying Capacity of the Priority Areas," contained in the MEIR documentation at page VIII-24. No reference is made to this table in the land use element of the general plan. Further, this table does not adequately relate residential dwelling units to numbers of people and it certainly does not constitute a statement of population density standards.

b. *Circulation element.*

Appellant further contends that the general plan is deficient for its failure to comply with the mandates of Government Code section 65302, subdivision (b) which requires in pertinent part that the plan include "[a] circulation element consisting of the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, and other local public utilities and facilities, *all correlated with the land use element of the plan.*" (Italics added.)

The trial court specifically found that the circulation element of the new general plan contained all of the factors required by subdivision (b) of Government Code section 65302. However, appellant asserts that the circulation element is not correlated with the land use element as required by the statute.

County contends that perfect correlation is not required and that in adopting the element it must be presumed to have determined that the correlation was sufficient to accommodate local conditions and circumstances. (Gov. Code, § 65300.7.) County further contends that "appellant has not demonstrated that the correlation in the general plan is not locally relevant." The court in *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334 evaluated the circulation element of the Mendocino County General Plan and found it deficient where the element did not expressly show any relationship between the "facilities" mentioned and the "land use element of the plan." According to the court, the relationship could not be determined by construction because the land use element itself was utterly deficient. The court concluded that the circulation element therefore fell short of compliance with section 65302, subdivision (b), because the facilities shown in it were not "correlated with the land use element of the plan." (123 Cal.App.3d at p. 363.)

Insofar as the Tuolumne County General Plan is concerned, the circulation element is contained in chapter VI: 2-3 and VI: 5 and on the display map which outlines existing and proposed roads designated as "arterial," "major collector," or "minor collector."[9]

---

[9]In its entirety, the textual portion of the transportation-circulation element of the general plan provides as follows: "TRANSPORTATION/CIRCULATION [policy]

"7 The street and highway network in the county will be classified according to the function they are intended to serve. The following four functional classifications will be used in Tuolumne County:

"*Arterial*—serves statewide and interstate travel. Primarily federal and state highways.

"*Major Collector*—serves intraregional travel. Average travel distances are shorter than on arterial routes.

"*Minor Collector*—collects traffic from local roads and channels it to major collectors or arterials. Serves to link locally important traffic generators.

"*Local Roads*—provide access to immediately abutting land uses or rural areas. Provide service over relatively short distances compared to collectors and arterials.

The MEIR documentation does contain a description of the existing road system and existing public transportation obtained from the *Tuolumne County Regional Transportation Plan,* prepared by Cal Trans, September 12, 1978. (MEIR documentation V:21-V:26.) Moreover, the MEIR documentation also contains a table listing "typical trip generation rates by type of land use." The types of use and the daily generation rate (number of trips per dwelling unit or per acre) were taken from a document entitled "*1982-87 Traffic Volumes in the City of Pittsburg.*"

■ Assuming that the information contained in the above sources constituted an adequate description of existing roadways and facilities, it does not appear that the circulation element is in any substantial way correlated with land use, despite the trial court's finding to the contrary.

In the present case it can be seen that the circulation element does not attempt to describe or discuss the changes or increases in demands on the various roadways or transportation facilities of the County as a result of changes in uses of land which will or may result from implementation of the decision system and the general plan. As stated in a letter from several individuals commenting upon the draft general plan, "The [MEIR] and the MDGP do not address the important issues such as the demographic center of the county, the population centers, the movement habits of users or the traffic counts of the main roads and intersections."

Although the Government Code does not explicitly require that a circulation element contain an inventory and data analysis followed by a locally derived program to solve problems identified in the inventory, and we do not so hold, it seems apparent from a review of the general plan, the supporting MEIR, and the MEIR documentation that there is no way to determine whether in fact the circulation element is correlated with the proposed land use element.

---

"8 The County of Tuolumne will ensure that both its existing and proposed street configurations serve the ultimate functions they are intended to serve by protecting their alignments from encroachment.

"9 The County of Tuolumne will encourage the development of a balanced transportation system, including public transit as well as privately operated vehicles.

"Scenic corridors along scenic routes in the county will be preserved.

". . . . . . . . . . . . . . . .

"TRANSPORTATION/CIRCULATION [implementation]

"G Adopt the functional street and highway classification indicated on the General Plan maps.

"H Ensure that rights-of-way for future streets are protected from encroachment by current development.

"I Designate as scenic routes those roads and highways listed in Appendix F. The appendix also indicates the scenic features and implementation recommendations associated with each scenic route."

The state Office of Planning and Research pursuant to Government Code section 65040.2 has adopted guidelines to assist the local governments in preparing general plans and the general plan guidelines, issued September 10, 1980, although merely advisory, do state that "[t]he policies and plan proposals of the circulation element should: [c]oordinate the transportation and circulation system with planned land uses . . . ." (*Id.,* at p. 112.) The guidelines go on to recommend assessment of the adequacy of the existing street and highway system and the need for expansion and improvements; trends in vehicle registration (by total and household average); trends in nonlocal traffic related to tourism, employment and shopping; and trends in traffic volume in relation to street and highway capacities (e.g., average daily traffic, peak hour volumes, seasonal fluctuations). (*Id.,* at p. 155.)

Although these guidelines are merely advisory and not mandatory, they provide assistance in determining whether the County's circulation element substantially complies with the requirements of section 65302. (See *Camp v. Board of Supervisors, supra,* 123 Cal.App.3d 334, 351.) The requirement of Government Code section 65302, subdivision (b), is that the land use element be correlated with the circulation element. The Tuolumne County General Plan does not comply with the statutory requirements in this regard.

### c. *Housing element.*

Government Code section 65302, subdivision (c), provided at the time of adoption of the general plan that the general plan "shall include": "A housing element, to be developed pursuant to regulations established under Section 50459 of the Health and Safety Code, consisting of standards and plans for the improvement of housing and for provision of adequate sites for housing. This element of the plan shall make adequate provision for the housing needs of all economic segments of the community. Such element shall consider all aspects of current housing technology, to include provisions for not only site-built housing, but also manufactured housing, including mobile homes and modular homes." (As amended by Stats. 1979, ch. 591, § 1, p. 1846.)[10]

Appellant contends that the housing element of respondent's general plan is defective and fails to meet statutory requirements in that it does not contain a current assessment of housing needs for various income groups, and because it does not include an "action" program. Therefore, appellant concludes that the housing element fails to make adequate provisions for the housing needs of all economic segments of the community as required by the applicable statute.

---

[10]Subdivision (c) was further amended in 1980.

This court does not address the adequacy of the housing element under the current statute. Our analysis extends only to the adequacy of the housing element under the law as it existed at the time of the adoption of the general plan. Insofar as current law may mandate further amendments to the housing element, that issue is not currently before us.

■ However, in fact it appears that the housing inventory in respondent's general plan (III:7-III:36 of the "MEIR documentation") is most complete. An assessment of needs is found at pages III:7 through III:23 of that documentation. Both the inventory and the needs assessment is based upon 1970 federal census data, a 1974 Special Census for Tuolumne County, and other documents prepared more recently, including the "areawide housing element (1978) prepared by the Central Sierra Planning Council for its member counties and cities (including Tuolumne County)." (MEIR documentation III:4-5.)

The inventory and the needs analysis appearing in the MEIR documentation appear adequate. The inventory of existing housing analyzes that information both in terms of specific area needs (see, e.g., MEIR documentation III:18-III:21) and in terms of age, ethnic composition, income and other variables. The inventory and needs assessment, despite the lack of 1980 federal census data at the time the plan was adopted, appear to be thorough and reasonable attempts to forecast housing needs in the future based upon the best available data. The plan itself provides for updating the assessment when the 1980 data is available (MEIR documentation III:23). The MEIR documentation contains the following statement with regard to its projections of Tuolumne County's 1985 housing needs based upon households expected and the anticipated numbers of low income households:

"These figures were obtained by applying the percentage of households which in 1974 had incomes below 80 [percent] of the 1974 median income (51.7 [percent]) to the population and household estimates for the County prepared by the Department of Finance in 1979. It should again be stated and recognized that more current data are necessary to validate these hypotheses. Cross-tabulations of household income and actual housing costs, by family size, are needed to determine if below-median income households are in fact paying more than 25 percent of their incomes for shelter.

"According to the Housing element guidelines, Tuolumne County should address the needs of the anticipated 1985 lower income households. This anticipated total of 6,924 households should be viewed with *caution,* as it does not represent the number of households who may be in need of housing because of overpayment in rental charges or mortgages. No determination of future needs was possible given the status of earlier information on this condition through Federal or state censuses or surveys. Tuolumne County should use the 6,924 households figure as a *target* household figure in their housing action program. A realistic assessment of the proportion of that figure that really *needs* housing program attention will have to await more detailed analysis available through the 1980 Census. No further breakdown is possible at this time.

"Finally, the County will address a Specific Action Program to achieve progress toward the needs of lower income households following the adoption of the revised General Plan." (MEIR documentation III:23, original italics.)

Despite appellant's contention that *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, requires the housing element to be based upon current data, we do not find that the lack of 1980 census data renders the housing element deficient in this case. In *Camp,* the housing element was briefly outlined in a separate pamphlet published in 1970. The cover page of the pamphlet was labeled "The Housing Element of the General Plan" but its text repeatedly described it as the *initial* housing element. There was no indication in that "Housing Element" that the more current 1970 census data was ever prepared or pursued. The general plan was adopted in 1978 and therefore the information utilized in the housing element was more than 10 years old at the time of adoption of the general plan, despite the fact that 1970 census data had been available since 1971. (*Id.,* at p. 351.) The court held that other deficiencies in the housing element, combined with its "obsolescence in point of time," rendered the housing element inadequate and not in substantial compliance with the requirements of section 65302, subdivision (c). However, in the instant case the failure of the County to incorporate 1980 census data which was unavailable at the time of adoption of the general plan in 1980 does not render the housing element inadequate.

A more difficult contention exists with respect to the declaration contained in the MEIR documentation that any adoption of an action program would follow the adoption of the general plan. The statute does require adequate provision for the "housing needs of all economic segments of the community." However, to the extent that the requirement of an action provision in the housing element was set forth in guidelines issued by the State Department of Housing and Community Development, such action program has been held to be advisory and not mandatory (see *Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 885 [170 Cal.Rptr. 342]; *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 997-998 [178 Cal.Rptr. 367]).

In analyzing the adequacy of the housing element presented as part of the Mendocino County General Plan the court in *Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, was concerned with the total inadequacy of the housing element in that case. In this case we do have a comprehensive and complete inventory of housing, based on the best data available at the time, and a thorough needs analysis. In *Bownds* v. *City of Glendale, supra,* 113 Cal.App.3d 875, the court held that the housing element of a city's master plan, which contained a comprehensive analysis of the existing housing inventory and future needs, was an "honest and reasonable effort to comply with the state's statutory requirements" and that failure to discuss in specific terms the

subject of condominium conversion in the general plan did not render the plan inadequate despite guidelines which required such discussion. The court held that in the absence of more specific legislation it would not interpret the guidelines as requiring a specific "action" program for the creation of housing "under the guise of declaring an otherwise complete and comprehensive plan to be inadequate, basing its decision on nothing more than a subjective interpretation of such nonspecific language." (*Id.*, at p. 884; see also *Stevens* v. *City of Glendale, supra,* 125 Cal.App.3d 986, 997-998.)

Therefore, insofar as appellant here contends that in 1980 when the general plan was adopted it was required to contain a specific "action" program in order for the housing element to meet the requirements of Government Code section 65302, subdivision (c), appellant's argument fails.

Moreover, it appears that the general plan does contain several policies and implementation measures designed to increase the available supply of housing, particularly lower cost housing. (See general plan IV:2-9.) Such implementation measures include the use of development density incentives requiring developers to include specific percentages of low and moderate income units in their development of inclusionary ordinances requiring a specific percentage of units within a new residential development be made available to low and moderate income purchasers or tenants. (General plan IV:8.) In addition, it is arguable that the entire decision system for the general plan and the policy and implementation measures contained in the general plan are aimed at making available more land for urban and residential uses. The EIR itself recognizes that the plan has designated more property as compatible for urban and residential development than in fact is likely to be developed within the next 20 years. However, it states that "[t]his characteristic of the MDGP is intended to allow for sufficient choice in locating new urban development, and to avoid unacceptable increases in the cost of land which could be caused by unduly constraining the supply of land available for development." (MEIR p. 5.)

For the foregoing reasons this court holds that the housing element of the Tuolumne County General Plan meets the statutory requirements set forth in Government Code section 65302, subdivision (c).

d. *Conclusion.*

Thus we conclude that the land use and circulation elements of the general plan do not substantially comply with the requirements of Government Code section 65302, subdivisions (a) and (b).

3. *Attorney's Fees.*

Appellant contends the trial court erred in not granting attorney's fees pursuant to Code of Civil Procedure section 1021.5 which provides as follows: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

The appellate court in *Starbird* v. *County of San Benito* (1981) 122 Cal. App.3d 657, 665 [176 Cal.Rptr. 149] concluded that the conditions for an award of attorney's fees against the county were present where appellants were successful in their action to require the county to prepare an environmental impact report in an action involving granting of a use permit. According to the court, because plaintiff "vindicated important rights of the people of San Benito County which were ignored by the officials charged with enforcing them . . . an attorney fee award is 'appropriate' (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 941, 942, 944 . . .), entitling the prevailing party 'to an award of attorney's fees under this statute' (*Mack* v. *Younger* (1980) 27 Cal.3d 687, 689 . . .)." The court remanded the matter to the trial court for the purpose of taking evidence on, and fixing, the reasonable amount of attorney's fees to be awarded.

■ It appears that remand to the trial court is the appropriate procedure in this case and we do so in order to allow the trial court to exercise its discretion under the statute to make the attorney's fees award decision. (See *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, 942 [154 Cal.Rptr. 504, 593 P.2d 200].)

DISPOSITION

The judgment is reversed with directions to the trial court as follows:

a. To issue a writ of mandate in accordance with the views herein expressed;

b. To conduct further proceedings concerning attorney's fees consistent with this opinion; and

c. To consider, if deemed appropriate, appellant's request for injunctive relief prayed for in its amended petition.

Franson, Acting P. J., and Andreen, J., concurred.