Filed 7/3/13  Visalia Smart Growth Coalition v. City of Visalia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORT

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VISALIA SMART GROWTH COALITION, | F065525 |
| Plaintiff and Appellant, | (Super. Ct. No. VCU243353) |
| v. | |
| CITY OF VISALIA, | |
| Defendant and Respondent; | **OPINION** |
| WAL-MART STORES, INC., | |
| Real Party in Interest and Respondent. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Lloyd L. Hicks, Judge.

M. R. Wolfe & Associates, Mark R. Wolfe for Plaintiff and Appellant.

Dooley, Herr, Peltzer & Richardson, Leonard C. Herr and Ron Statler for Defendant Respondent.

Gresham, Savage, Nolan & Tilden, Jennifer M. Guenther and Tracy M. Owens for Real Party in Interest and Respondent.

-ooOoo-

This case concerns the City of Visalia's approval of a conditional use permit for the expansion of an existing retail store into a 24-hour supercenter. An unincorporated association called Visalia Smart Growth Coalition (Coalition) petitioned the superior court for an order setting aside the city's approval, alleging violation of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.)[1] (CEQA). The superior court granted and denied the petition in part.

The Coalition appeals the portion of the court's decision denying part of the petition. It contends that the lead agency, the City of Visalia (city), violated the procedural requirements of CEQA by failing to disclose required information in the EIR in response to public comments. In particular, the Coalition argues that the city failed to provide information and calculations supporting the EIR's determination that a 14-foot masonry wall would mitigate noise impacts for residents living near the store's proposed loading docks.

We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORIES

### Proposed expansion project

Real party in interest Wal-Mart Stores, Inc. (Walmart), has proposed expanding and remodeling an existing Walmart store located on East Noble Avenue in east-central Visalia. The expansion project extends to the east of the existing store, adding 3.8 acres of adjacent land to the Walmart site. The project adds 54,076 square feet of floor area to the existing 133,206-square-foot store, primarily to accommodate a new grocery sales department. The current store hours are 8:00 a.m. to 10:00 p.m., and the operating hours after the expansion will be 24 hours per day, seven days per week.

The project site is zoned "Planned Shopping/Office Commercial," which requires a conditional use permit for general merchandise stores larger than 40,000 square feet.

---

[1]Subsequent statutory references are to the Public Resources Code unless indicated otherwise.

2.

The existing Walmart was constructed pursuant to an approved conditional use permit, which is still in effect. The land surrounding the project site is a mix of commercial, office, residential, church, and public facility uses. The lands to the east and south of the project site are largely in residential use. Single-family residences are located about 25 to 45 feet south of the southern Walmart property line. There is a wall approximately five to six feet tall between these homes and the Walmart site. Multi-family residences are located approximately 10 feet east of the eastern project boundary, and a five-to-six-foot-tall wall also separates these residences from the project site. The Walmart loading docks are currently located at the southeast corner of the store, approximately 100 feet from the nearest homes to the south and 400 feet from the nearest homes to the east. There are two truck loading bays and one trash compactor. A 14-foot masonry block wall runs from the existing loading dock area eastward about 250 feet.

The project will add four truck loading bays, for a total of six loading docks, which will be located at the rear southeast corner of the expanded building. The new loading docks will be about 120 feet east of the current docks. The existing trash compactor will be relocated to the east with the loading docks, and a second trash compactor will be added on the east wall of the expanded building, north of the relocated loading docks.

Currently, the store receives up to eight semi-trailer deliveries and up to seven smaller vendor truck deliveries per day. With the expansion, the Walmart will receive up to 11 semi-trailer deliveries, of which about two will be refrigerated trucks, and up to 12 smaller truck deliveries per day. Deliveries by semi-trailer could occur any time of day or night.

### Noise analysis

The city hired an environmental consulting firm to prepare a draft EIR (DEIR) on the expansion project. The DEIR included an analysis of potential noise impacts. An acoustics and air quality engineering firm conducted a noise assessment, and the DEIR's discussion on noise impacts was based on the firm's assessment.

3.

As a preliminary matter, the DEIR explained some relevant terms and units of measure used in the noise analysis. Sound levels are usually measured in decibels (dB), and noise measurements that take into account human hearing are called A-weighted and are expressed as dBA. Different measures of noise levels are used to account for the changes in noise levels that occur over time. The maximum instantaneous noise level measured is expressed as $L_{max}$. The average A-weighted noise level during a specific period of time (commonly one hour) is $L_{eq}$. The "Day/Night Average Sound Level" (italics omitted) takes into account increased sensitivity to noise during the night by adding a 10 dB penalty to nighttime (10:00 p.m. to 7:00 a.m.) noise levels and is expressed as $L_{dn}$.

A noise monitoring survey was conducted for a 24-hour period in June 2009 to measure the existing noise environment at residential receivers near the proposed loading docks. Daytime hourly average noise levels ranged from 45 to 57 dBA $L_{eq}$, nighttime hourly average noise levels ranged from 42 to 50 dBA $L_{eq}$, and the day/night average was calculated to be 55 dBA $L_{dn}$.

In analyzing the noise impacts, the DEIR assumed that an increase in the $L_{dn}$ of 3 dBA would be considered a significant impact when the projected noise levels would exceed those considered satisfactory for the affected land use. In addition, an increase in the $L_{dn}$ of 5 dBA would be considered significant when the projected noise levels would remain below those considered satisfactory for the affected land use.[2] The DEIR assumed the project would comply with the city's noise ordinance, Visalia Municipal Code section 8.36.040, which sets categorical noise level standards. The ordinance makes it unlawful to create any instantaneous noise that exceeds 70 dBA $L_{max}$ during the day or 65 dBA $L_{max}$ during the evening and nighttime. It is also unlawful to create a

[2]It appears that "satisfactory" noise levels for residential land use as used in the DEIR means noise levels not exceeding 65 dBA $L_{dn}$. This would comply with Policy 1.2 of the noise element of the city's general plan, which is described on page 201 of the DEIR.

noise that exceeds 50 dBA for a cumulative period of 30 minutes in any one-hour period during the day or 45 dBA during the evening and nighttime.[3]

The DEIR reported that the predominant operational noise sources associated with the project will be additional parking lot activity, increased truck deliveries made at the rear of the store, the additional trash compactor, additional roof-top mechanical equipment, and additional loading dock activities. The highest noise levels at adjacent homes typically will be generated by trucks circulating along the southern and eastern sides of the store and by loading activities at the southeast corner of the building. The DEIR reported that heavy truck deliveries and commercial trash collection generate maximum instantaneous noise levels of 70 to 75 dBA $L_{max}$ at a distance of 50 feet. Maximum instantaneous noise levels generated by heavy trucks circulating along the south property line are expected to reach 72 to 77 dBA $L_{max}$ at the property lines of the nearest residences when trucks are at a distance of 40 feet.

The project plan will add a new 14-foot noise barrier to the south of the loading docks that will provide acoustical shielding for the six single-family residences nearest the proposed loading area. According to the DEIR, "[m]aximum noise levels in the rear yards of the nearest residences behind the proposed 14-foot masonry wall along the southern site boundary … are calculated to range from 56 to 61 dBA $L_{max}$." This would be below the city ordinance's maximum instantaneous noise levels for day and nighttime. Later in the noise analysis (in a discussion of noise generated by refrigeration trucks running while parked at the loading docks), the DEIR stated, "The proposed 14-foot noise barrier would provide 16 dBA of attenuation from this noise source at a receiver positioned 5 feet above the ground."

---

[3]The ordinance has five categorical standards. The maximum noise level for 30 minutes in a one-hour period is designated category 1. The maximum noise level for instantaneous noise ($L_{max}$) is category 5. Categories 2 through 4 are the maximum noise levels for cumulative periods of 15 minutes, five minutes, and one minute per hour, respectively.

The initial project plan also included the construction of an eight-foot wall to the east. With the eight-foot barrier, truck circulation would generate maximum instantaneous noise levels ranging from 65 to 70 dBA $L_{max}$ at the nearest residences along the easternmost property boundary. The DEIR determined that the project's operational noise impacts would be significant since the noise generated would exceed the nighttime noise level limit of 65 dBA $L_{max}$. The DEIR suggested increasing the height of the wall planned along the eastern boundary to 15 feet, which would reduce noise to within the nighttime noise level limit. This suggestion was adopted by Walmart and incorporated into the project plans.

### *Public comments, final EIR, and approval of the project*

The DEIR was circulated for public review and comment. The public comment period began on October 14, 2010 and ended November 29, 2010. In a letter dated November 29, 2010, the Coalition commented on many aspects of the DEIR, including its discussion of the project's noise impacts. Among other things, the Coalition questioned the DEIR's conclusion that the planned 14-foot wall would be an adequate noise barrier. It cited the Federal Highway Administration's (FHWA) "Highway Traffic Noise Analysis and Abatement Policy and Guidance" (June 1995) and wrote that the FHWA has concluded that it is very difficult to attain attenuation over 15 dBA through sound barriers. "In view of this," the Coalition wrote, "please explain on what basis the DEIR or Noise Assessment determined that a 14 foot wall would result in attenuation of 16 dBA ...." It specifically requested "any calculations used to determine the attenuation provided by the sound wall for each instance in which attenuation from the sound wall was assumed to reduce noise to receivers" and identification and documentation of "any assumptions regarding the efficacy of barriers."

The city released the final EIR (FEIR) in April 2011. It addressed the Coalition's comments regarding the 14-foot wall as follows:

> "Sound Wall: The reference made to FHWA's discussion regarding noise barrier limitations is misleading. FHWA presents this information based on its experience with highway noise and highway noise barriers. Highways

6.

are characterized as line sources whereas noise sources associated with delivery trucks, loading and unloading activities, mechanical equipment, etc. are treated as point sources. The maximum practical reduction provided by a noise barrier for a point source is 24 dBA.

"The methodology used to predict noise levels followed standard barrier theory and assumed spherical propagation losses with no excess attenuation. Noise source locations were based on the geometrical information contained in the project plans, as discussed in detail on page 212 of the DEIR, and were calculated at either the residential property plane or at a position 15 feet inside the residential property plane (approximating the center of the rear yard) to calculate the barrier insertion loss."

On April 25, 2011, the city planning commission held a public hearing on the project. The Coalition submitted a letter to the commission, dated April 25, 2011, criticizing the FEIR's response to its previous comments. With respect to the 14-foot wall as a noise barrier, the Coalition wrote:

"In our comments on the Draft EIR, we questioned the assumption that the proposed 14 foot sound wall would attain 16 dB of noise attenuation, citing an FHWA publication that indicated it is 'very difficult' for sound walls to [attenuate] noise by more than 15 dB. We asked for calculations of assumed attenuation and documentation of any assumptions regarding the efficacy of barriers. In response, the Final EIR asserts, without documented authority (other than an oblique reference to 'standard barrier theory'), or calculations that the FHWA publication applies to line sources and that a 24 db attenuation is possible for point sources like the Project. The Final EIR does not provide calculations or document its assumed barrier efficacy, other than to say it was based on data in the Project plans. This is simply unresponsive to our request in comments on the Draft EIR that the City 'document any assumptions regarding the efficacy of barriers.'"

During the public hearing, many speakers offered their opinions on the expansion project. For example, a resident who lived south of the Walmart store opposed the project. She told the planning commission that her home was five feet away from the current 14-foot wall and, during a previous remodeling project, she heard "a lot of forklift noises, hydraulic noises, [and] delivery trucks." She believed the new project would be extremely disruptive to the neighbors.

A consultant from the acoustics firm that conducted the noise analysis also spoke at the hearing. He explained that a sound wall "doesn't mean that you're not going to hear activities at some point in time." He continued, "All of our conservative calculations were made with the new sound walls in place, the existing sound walls, and were found to meet the City's municipal code limits both day and night. So hopefully that answers that." The consultant also addressed the Coalition's letter as follows:

> "[W]ith regard to the [Coalition] letter, there's a statement that the—a noise barrier 14 feet high could not achieve a 16-decibel reduction or that would be very difficult. There's a little bit of confusion here because this is referencing an F.H.W.A. statement, Federal Highways Administration, which deals with freeways, line sources, these are much more difficult to mitigate than point sources. And the practical limit for reducing noise from a point source, such as a maximum noise level from a door slam or a truck or pallet jacks, is 24. So we're well within the range of feasible noise reduction."

After the close of the public hearing, the commission voted to certify the FEIR and approve Walmart's conditional use permit application, subject to certain conditions. One of the conditions required a follow-up study of noise impacts after the expansion project was in operation. It provided:

> "Within one year of commencement of operations of the expanded store area or new loading docks, the applicant shall bear the costs of one acoustical [analysis] conducted by the noise consultant the City retained to prepare the EIR's noise study and EIR analysis. The study shall be undertaken at the City's sole discretion and timing. The purpose of the [analysis] shall be to establish the project's compliance with Community Noise Standards for sensitive receptors adjacent to the project site."

The vote was three in favor and two against.

### Appeal to city council, response from consultants, and denial of appeal

In a letter dated May 4, 2011, the Coalition appealed the planning commission's actions of certifying the EIR and approving the project to the city council. The environmental consultants who prepared the EIR wrote a rebuttal memorandum to comment letters the city received on April 25, 2011, including the Coalition's letter. This rebuttal memorandum was dated May 11, 2011. As part of the rebuttal, the acoustics

firm that conducted the noise analysis prepared a response to the comments regarding the 14-foot wall as follows:

> "The reference made to FHWA's discussion regarding noise barrier limitations misleads the reader, causes confusion, and is not applicable to noise barrier attenuation from sources such as delivery trucks, loading and unloading activities, mechanical equipment, etc. Industry-accepted methods [citing Harris, Cyril M., Handbook of Acoustical Measurements and Noise Control, Third Edition (1998) (Harris's Handbook)] were used to calculate noise levels assuming distance from the noise source and the attenuation provided by noise barriers. Noise attenuation with distance from a point source follows the 'inverse square law' of sound propagation, where sound pressure levels decrease at a rate of 6 dB per doubling of distance from the source. The attenuation provided by a 'thin' noise barrier, such as a masonry wall, results from a single-diffraction of sound, and is calculated by determining the difference in distance that the sound travels assuming a noise barrier is in place (diffracted path) as compared to the direct path assuming no noise barrier is in place (line-of-sight path). The barrier provides a noise reduction for receivers located within its 'shadow zone,' and for … each calculation, receivers were assumed to be located 15 feet from the noise barrier, and clearly within the 'shadow zone' of a 14-foot noise barrier. As discussed previously, the maximum practical reduction provided by a thin noise barrier is 24 dBA, and the predicted noise reduction is well within the feasible range of noise reduction that could be provided by a 14-foot noise barrier." (Fn. omitted.)

The Coalition then hired Derek Watry, a principal at another acoustical consulting firm, to review the DEIR, FEIR, and the city's rebuttal memorandum. In a letter dated May 14, 2011, Watry wrote that the sound attenuation attributed to the 14-foot wall was "overly optimistic" at least in part because the equation provided by Harris's Handbook did not account for real-world physical conditions. Watry explained:

> "Unlike the idealized situation represented in [Harris's Handbook], the Walmart wall is not in the middle of an open field. Rather, the Walmart store itself is only 40 [feet] away and is itself roughly 25 [feet] high. The acoustically hard space formed by the building, the pavement, and the wall will be a reverberant space in which sound energy will build up, effectively amplifying the level and raising the height of the noise source. Additionally, sound will reflect off the part of the building that is higher than the top of the sound wall, creating a secondary, pseudo-source. Finally, the truck itself presents a large, flat, hard surface from which sound will both radiate and reflect. Treating this situation as a point source

9.

(which, for practical purposes, means the dimensions of the object are much smaller than the other distances involved) in an open field is overly simplistic.…

"Acoustical modeling of this situation would take more time than available. Had calculations been provided, we could have reviewed those, but they have not been. Given the reference to [Harris's Handbook] text, the explicit statement that the barrier attenuation 'results from a single diffraction of sound,' and the 16 dB efficacy which is higher than the FHWA and INCE [International Institute of Noise Control Engineering] studies indicate likely, it would seem very unlikely that the noise analysis for the Walmart DEIR accounts for the degradation due to the real world conditions."

Watry also noted that the DEIR was inconsistent in describing the southern walls—the DEIR at different places referred to 17-foot and 15-foot walls, as well as the planned extension of the 14-foot wall.

A public hearing on the Coalition's appeal was held on May 16, 2011. In support of the appeal, the Coalition submitted a letter to the mayor and city council dated May 16, 2011, with attached documents, including the Watry letter.

In addition, neighbors of the Walmart store spoke at the hearing. For example, one resident told the city council that 24-hour operation would "create quite a disruptive atmosphere to our lives." He specifically mentioned noise pollution, which was already an issue with the current operation of the store. Another speaker read a letter signed by homeowners who were unable to attend the hearing. She read, "For years we have endured loud noises from revving truck engines, beeping forklifts, delivery vehicles, and the use of storage facilities at the store. The sounds occur at all hours of the night and early morning. Some of us have complained repeatedly to the city, to no avail. The noise disturbs our sleep and causes substantial stress." She expressed concern that mitigation efforts would fail, "just as the existing sound wall, which is supposed to shield our homes from Wal-mart noise, clearly does not work at all."

After hearing testimony from the public, the city council closed the hearing, and city staff requested a continuance to allow the city's environmental consultants to review

10.

and respond to the Coalition's most recent letter, which was submitted on the day of the hearing.

The city's environmental consultants prepared a response to the Coalition's May 16, 2011, letter. Regarding the comments about reflected and amplified noise, the consultants wrote:

> "The commenter and his retained noise consultants indicate that the soundwalls would be less effective than the DEIR concluded due to 'refraction' from 'radiated reflective noise.' This possibility was in fact taken into account during preparation of the noise analysis.… The orientation of the building with respect to the location of [a] truck when it is nearest the most-affected neighbors would not allow for a direct reflection of noise back toward the residences. [¶] Possible minor reflections off of the expanded Walmart building were accounted for in the calculations of noise levels at offsite receiver locations and were determined to be negligible at a distance of 200 feet (i.e. the distance between [a] large truck and the Walmart Building when the truck would be closest to the receiver [at the location tested]), given the building's orientation."

In response to the Coalition's reference to FHWA standards, the consultants reiterated their position that there is a difference between a line source, such as a freeway, and a point source, such as a retail store site. They explained that a line source is "'[m]ultiple *point sources* moving in one direction, e.g., a continuous stream of roadway traffic, radiating sound cylindrically [along a line].'" Sound levels from a line source decrease at a rate of 3 dB per doubling of distance. Sound levels measured from a point source, on the other hand, decrease at a rate of 6 dB per doubling of distance. Delivery trucks and unloading activities are considered point sources because they generate individual and intermittent noises from a single source, not continuous noise distributed along a line.

The consultants also briefly discussed what they meant by "standard barrier theory." Under standard barrier theory, the noise reduction that can be achieved by a sound wall is based on the difference between the distance the sound travels to a receiver with the barrier in place and the distance the sound travels to the receiver in a direct path with no barrier in place (known as the "line-of-sight path"). A table was included

11.

showing the expected range of reduction in sound level by path-length difference. It was explained that the line-of-sight path from the nearest noise source to the nearest residential receiver is 45 feet. The diffracted path length from the nearest noise source over the planned 14-foot wall to the nearest receiver is 48.5 feet. The calculated reduction in sound level based on the path difference is 15 dBA. The response included attached calculations from the acoustics firm that prepared the noise analysis. These appear to be handwritten calculations on lined note paper.

On June 20, 2011, the city council voted to deny the Coalition's appeal. The city council upheld the approval of the conditional use permit for the expansion project subject to various added conditions, including the prohibition of loading dock deliveries and bailing and pallet operations between the hours of 10:00 p.m. and 6:00 a.m.

### *Writ petition*

The Coalition filed a petition for writ of mandate on July 19, 2011, challenging various aspects of the EIR. The Coalition prevailed on an issue unrelated to the noise analysis, and the trial court ordered the city to set aside certification of the EIR. The court, however, rejected the Coalition's arguments regarding the noise analysis. The court reasoned:

> "Petitioners' comments included a demand that they be provided the actual calculations of the experts. The response to this demand was to advise that it was 'standard barrier theory.' [¶] Petitioners claim they need the calculations to 'check the math.' The calculations were ultimately provided after the comment period expired.

> "The goal of CEQA is to provide information that is 'meaningful and useful to decision makers and the public' … and not just to generate paper …. [¶] The actual calculations were utterly meaningless to a non-expert, and not necessary for an expert, who could use 'standard barrier theory' to 'check the math.' [¶] There was no error by City in the response to comments relating to barrier noise attenuation."

The Coalition filed a notice of appeal on July 27, 2011.

*DISCUSSION*

"The EIR has often been called the heart of CEQA.  [Citation.]  It is an informational document whose purpose is to inform the public and decision makers of the environmental consequences of agency decisions before they are made.  [Citation.]" (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 706.)  "An adequate EIR must be 'prepared with a sufficient degree of analysis to provide [decision makers] with information which enables them to make a decision which intelligently takes account of environmental consequences.'  [Citation.]  It 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.'" (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 26.)  "CEQA requires an EIR to reflect a good faith effort at full disclosure[, but] it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Ibid.*)

"A public agency's decision to certify the EIR is presumed correct, and the challenger has the burden of proving the EIR is legally inadequate." (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546.)  The Court of Appeal reviews the trial court's decision de novo, applying the same standards to the agency's action as the trial court applies.  (*Id.* at pp. 1546-1548.)

When a petitioner challenges an agency's decision based on alleged noncompliance with the provisions of CEQA, the reviewing court's inquiry extends "only to whether there was a prejudicial abuse of discretion." (§ 21168.5.)  "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence.  The court does not pass on the correctness of an EIR's environmental conclusions, but determines whether the EIR is sufficient as an informational document.  [Citations.]" (*Dry Creek Citizens Coalition v. County of Tulare*, *supra*, 70 Cal.App.4th at p. 26.)

"When the specific claim of legal error concerns an omission of required information from the EIR, the plaintiff must demonstrate that (1) the EIR did not contain

13.

information required by law and (2) the omission precluded informed decisionmaking by the lead agency or informed participation by the public. [Citation.] These two elements constitute an abuse of discretion and prejudice, respectively, and together form reversible error." (*Madera Oversight Coalition, Inc. v. County of Madera* (2011) 199 Cal.App.4th 48, 76-77.)

In this appeal, the Coalition does not challenge the sufficiency of the evidence supporting the city's findings. It contends only that the city violated CEQA by failing to disclose the factual basis for the EIR's conclusions regarding the effectiveness of noise mitigation.

First, the Coalition asserts that the acoustics firm's noise attenuation calculations should have been included in the DEIR or in a technical appendix to the DEIR. The noise analysis section of the DEIR informed readers of the potential increase in noise from additional truck deliveries and other operational activities that would result from expanding the store. The DEIR quantified the likely increase in deliveries (about three additional semi-trailer deliveries and five additional smaller truck deliveries per day) and described in weighted decibels the maximum instantaneous noise created by the circulation of heavy trucks (72 to 77 dBA $L_{max}$ at the property lines of the nearest residents). It described the proximity of nearby single-family and multi-family residences to the proposed loading docks. It reported that a 14-foot wall would be built, and an acoustics firm had calculated that the wall would reduce operational noise to within the limits set by the city noise ordinance. This gave readers information on the project's potential noise impacts and the basis for the DEIR's determination that operational activities would not result in significant noise impact.

While it may have been helpful to certain readers (those with technical knowledge of acoustics) to have included the noise attenuation calculations in an appendix (see Cal. Code Regs., tit. 14, § 15147), we decline to hold that the DEIR was inadequate under CEQA merely because the noise attenuation calculations were not included. As we have discussed, an EIR should provide sufficient information for decision makers to take

14.

account of environmental consequences, but it need not be exhaustive. (*San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594.) The DEIR in this case provided sufficiently detailed analysis to alert the public to the noise issue and to allow decision makers to intelligently take account of the noise that would be generated by the expansion project.

The Coalition cites *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 442 (*Vineyard Area Citizens*), for the proposition that, if an agency certifying an FEIR as complete has "relied on information not actually incorporated or described and referenced in the FEIR," the agency has failed to proceed in the manner provided in CEQA. The facts of *Vineyard Area Citizens*, however, are distinguishable from the present case. In *Vineyard Area Citizens*, our Supreme Court concluded that the EIR for a large mixed-use development project lacked substantial evidence of a sufficient long-term water supply for the project. (*Vineyard Area Citizens, supra,* at p. 439.) The court observed factual inconsistencies and lack of clarity in the discussion of (1) future demand for water in the area and (2) the amount of new surface water potentially available to serve that growth. (*Ibid*.) The FEIR used varying water supply figures in different parts of its discussion, and it relied on a prior water agreement but used estimates that diverged from the prior agreement without explanation. (*Id*. at pp. 423, 439-440.) The FEIR also noted that a full analysis would be available in a water agency's plan update that was not yet complete. (*Id*. at p. 440.) In that context, the court held that the lead agency could not salvage an incoherent FEIR based on information not incorporated in the FEIR.

In this case, the DEIR did not rely on a future plan or project, and there were no inconsistencies or obfuscations similar to those described in *Vineyard Area Citizens*. The DEIR clearly relied on a noise analysis performed by an acoustics firm. Further, in *Vineyard Area Citizens,* the court concluded that the lack of clarity in the EIR and its reliance on a future plan demonstrated there was no substantial evidence to support the the EIR's determinations. Here, in contrast, there is no claim that the EIR lacked

15.

substantial evidence.  For these reasons, the Coalition's reliance on *Vineyard Area Citizens* is misplaced.  The Coalition's main contention is not that CEQA required the inclusion of the noise attenuation calculations initially, but that the city failed to provide a meaningful response to the Coalition's comment made during the public review and comment period.

The Guidelines for Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq., hereafter Guidelines) provide that a lead agency must "evaluate comments on environmental issues received from persons who reviewed the draft EIR" and prepare a written response.  (Guidelines, § 15088, subd. (a).)  "The written response shall describe the disposition of significant environmental issues raised (e.g., revisions to the proposed project to mitigate anticipated impacts or objections).  In particular, the major environmental issues raised when the lead agency's position is at variance with recommendations and objections raised in the comments must be addressed in detail giving reasons why specific comments and suggestions were not accepted.  There must be good faith, reasoned analysis in response.  Conclusory statements unsupported by factual information will not suffice."  (*Id.*, subd. (c).)

In *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 678-687 (*Twain Harte Homeowners*), we discussed the scope of a lead agency's discretion in responding to public comments.  The case involved approval of a county general plan; members of the public submitted comments on a variety of matters, and the lawsuit claimed that the county's responses, included in the final EIR, were inadequate.  We disagreed, explaining:

> "The determination of the sufficiency of County's responses to comments upon the draft EIR turns upon the detail required in such responses.…  The sufficiency of the EIR is to be viewed in light of what is reasonably feasible.  Courts should look for adequacy and completeness in an EIR, not perfection.  [Citation.]  'While the decision makers must take account of environmental objections [citations], satisfactory answers to these objections may be provided by reference to the EIR itself [citation].'  [Citation.]  …  [¶]  In the instant case it does appear that the County responded fully and adequately to comments in numerous instances and

16.

that they addressed in great detail many of the issues raised by appellant. The responses as a whole evince good faith and a reasoned analysis, despite the fact that the responses are not exhaustive or thorough in some specific respects. They adequately serve the disclosure purpose which is central to the EIR process." (*Twain Harte Homeowners*, *supra*, 138 Cal.App.3d at p. 686.)

In this case, the Coalition referred to a noise policy from the FHWA that indicated it was very difficult to attain 15 dBA of attenuation by a noise barrier and requested the "basis" for the DEIR's determination that a 14-foot wall would result in attenuation of 16 dBA and "any calculations used." In response, the FEIR explained that the FHWA policy related to line sources of noise, whereas the Walmart operational noises were treated as point sources. For point sources, the maximum practical reduction provided by a noise barrier is 24 dBA. The response did not include any calculations as requested by the Coalition, but it did describe the basis for the determination that the 14-foot wall would achieve a 16 dBA reduction of noise, stating: "The methodology used to predict noise levels followed standard barrier theory and assumed spherical propagation losses with no excess attenuation. Noise source locations were based on the geometrical information contained in the project plans .…"

This response adequately served the disclosure purpose which is central to the EIR process. (*Twain Harte Homeowners*, *supra*, 138 Cal.App.3d at p. 686.) The Coalition asserts that the FEIR's failure to provide noise attenuation calculations in response to a specific request for such calculations violated CEQA as a matter of law, but it is not the rule that every information request must be answered in detail. "When responding to comments, lead agencies need only respond to significant environmental issues and do not need to provide all information requested by reviewers, as long as a good faith effort at full disclosure is made in the EIR." (Guidelines, § 15204, subd. (a).) "The level of detail required in a response to a comment depends on factors such as the significance of the issues raised .…" (*City of Long Beach v. Los Angeles Unified School Dist*. (2009) 176 Cal.App.4th 889, 901.) Here, the Coalition's comment and information request did

17.

not raise "major environmental issues" at variance with the EIR (Guidelines, § 15088, subd. (c)) or significant new issues.

The issue of increased operational noise from the expansion project had been raised in the DEIR and discussed in detail. The Coalition's comment simply questioned the efficacy of the proposed sound wall, given the FHWA's statement that it was difficult to attain that level of attenuation with a noise barrier alone. In response, the FEIR addressed the Coalition's concern, explaining that the FHWA policy applied to a different type of noise source and was not relevant to the noises generated by the expansion project. This was responsive to the Coalition's comment, and nothing in the record suggests that it was not made in good faith.

The Coalition relies on three cases to support its position that the FEIR's response to its request for noise attenuation calculations was deficient as a matter of law. We conclude, however, that this case is not analogous to the cited cases.

*People v. County of Kern* (1976) 62 Cal.App.3d 761, 767, concerned a proposal to develop a subdivision on 275 acres that was zoned for light agricultural use. A 13-page draft EIR, including an addendum, was circulated for comment. (*Id*. at p. 768.) During the comment period, the county received comments from the Kern County Health Department, the United States Forest Service, and the Kern County Public Works Department indicating that the proposed high density development project would require significant amounts of underground water and would adversely affect other water users in the area. (*Id*. at p. 771.) Although the final EIR failed to respond to these comments, the county certified the EIR. The Attorney General filed an action challenging the adequacy of the EIR, and this court concluded that the EIR was fatally defective. (*Id*. at p. 769; *People v. County of Kern* (1974) 39 Cal.App.3d 830, 842.)

Subsequently, the county adopted a resolution in an attempt to comply with CEQA. (*People v. County of Kern*, *supra*, 62 Cal.App.3d at p. 766.) In response to the previous comments regarding water supply, the resolution provided, "*All available data* indicates that underground water available from these three wells is fully adequate to

18.

supply all projected water needs of the residents who would reside upon the property if [the applicant] is allowed to develop the property [as proposed]." (*Id*. at p. 772.) We concluded, however, that the county's resolution failed to respond to the claimed inadequacy of data to determine the effect of the development on the ground water supply. (*Id*. at p. 771.) Despite the reference to "[a]ll available data," the county had failed to identify *any* data that it relied on to conclude that the water supply was adequate. (*Id*. at p. 766.) In lieu of data, the county suggested it could cost as much as $100,000 to $200,000 to conduct a water resources study of the area. We recognized that the cost did "not absolve the [county] of its duty of making a response based on specified current data or water studies of some kind which would indicate the true picture of the water supply for the area." (*Id*. at p. 773.) In sum, the resolution was "window dressing" and was not a good faith response to adverse environmental criticisms. (*Id*. at p. 775.)

In *Cleary v. County of Stanislaus* (1981) 118 Cal.App.3d 348, 352, a landowner proposed amending a county general plan to change the zoning designation for his land from exclusively agricultural to planned development. During the comment period for the EIR for this proposal, the air resources board commented that the air quality analysis was inadequate as there was no air quality analysis at all. The air resources board wrote that the county would need to discuss estimated emissions generated by the project and mitigation measures to reduce the impact of the project. (*Id*. at p. 357.) The county responded: "'The Air Resources Board seems very concerned with the effect of the proposed project on air quality. This was not one of the concerns of the Environmental Review Committee and as such was not discussed extensively. On a regional basis the increase in traffic generated by the proposed use is insignificant. For this reason, mitigation measures were not discussed.'" (*Id*. at p. 358.)

This court concluded that the county's cursory response to the air resources board's comments was inadequate. We observed, "'"[W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project …, these

19.

comments may not simply be ignored. There must be good faith, reasoned analysis in response."'" (*Cleary v. County of Stanislaus*, *supra*, 118 Cal.App.3d at p. 358, quoting *People v. County of Kern*, *supra*, 62 Cal.App.3d at p. 771.)

*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2003) 106 Cal.App.4th 715, 718 (*SCOPE*), involved a proposed mixed residential and commercial development, including 2,545 housing units. The draft EIR described the water supply for the project based in part on State Water Project (SWP) entitlements. (*Id*. at pp. 718-719.) The SWP, however, had not been completed. (*Id*. at p. 721.) During the public comment period, the county received a comment indicating there was no guarantee that water purveyors would receive their full SWP entitlements. (*Id.* at p. 719.) The final EIR included a response to the comment, but the Court of Appeal concluded that the response was not sufficient. The court explained:

> "It is not enough for the EIR simply to contain information submitted by the public and experts. Problems raised by the public and responsible experts require a good faith reasoned analysis in response. [Citation.] The requirement of a detailed analysis in response ensures that stubborn problems or serious criticism are not 'swept under the rug.' [Citation.]
>
> "Here the draft EIR gives no hint that SWP entitlements cannot be taken at face value. It is only in response to comments and submissions by project opponents … that the EIR obliquely acknowledges that the entitlements may not be all they seem. Instead of undertaking a serious and detailed analysis of SWP supplies, the EIR does little more than dismiss project opponents' concerns about water supply. Water is too important to receive such cursory treatment.
>
> "The final EIR's acknowledgement that there 'could be a deficit of supply' does not cure the defect. Without some reasonably accurate estimate of SWP's ability to deliver water, it is impossible to judge how likely or how deep the deficit might be." (*SCOPE*, *supra*, 106 Cal.App.4th at p. 723.)

The court concluded that the county's approval of the EIR was not supported by substantial evidence. (*SCOPE*, *supra*, 106 Cal.App.4th at p. 724.)

The facts of this case are nothing like the cases cited by the Coalition. The city undertook a noise analysis and the noise discussion in the DEIR was based on that analysis. The FEIR did not ignore or brush off the Coalition's concern; it addressed the concern by explaining that the FHWA policy was not applicable.

Further, the Coalition has not met its burden of demonstrating prejudice. "Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.) "Failure to comply with the information disclosure requirements constitutes a prejudicial abuse of discretion when the omission of relevant information has precluded informed decisionmaking and informed public participation, regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.) An omission is prejudicial "if the decision makers or the public is deprived of information necessary to make a meaningful assessment of the environmental impacts." (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 468.)

In this case, the DEIR included a detailed discussion of the noise generated by the expansion project and described the 14-foot wall that will be built to shield southern neighbors from noise. The FEIR explained that the acoustics firm that prepared the noise analysis treated operational noises as point sources, and its noise attenuation calculations used "standard barrier theory and assumed spherical propagation losses with no excess attenuation." This provided the decision makers and the public with sufficient information to assess the project's operational noise impacts. We observe that the proposed 14-foot wall will be an extension of an existing 14-foot masonry block wall.

Even without the noise-attenuation calculations, readers of the EIR (most of whom likely did not possess technical knowledge of acoustics) understood that the proposed 14-foot wall will be similar to the existing wall. For example, a resident south of the current 14-foot wall told the city planning commission that she had heard construction noises

21.

during a previous remodeling project, and later, a group of residents wrote to the city council to object to the expansion project, noting that the existing wall did not work to shield their homes from Walmart noise.  Thus, the decision makers were well aware of the issues of the potential noise impact of the expanded Walmart on nearby residents generally and the efficacy of the proposed sound wall specifically.  The planning commission required a follow-up noise analysis to ensure the project was in compliance with community noise standards.  The city council added the condition that loading dock deliveries could not occur between 10:00 p.m. and 6:00 a.m.  Under these circumstances, the decision makers were not precluded from making an informed decision on the project, and the public was not precluded from informed public participation.

## *DISPOSITION*

The judgment affirmed.  Respondents are awarded costs on appeal.


_____

Wiseman, Acting P.J.


WE CONCUR:


_____

Levy, J.


_____

Detjen, J.